## CLARK v. CARTER, State Auditor.

No. 11844—Opinion Filed March 28, 1922.

(Syllabus.)

**1. States—State Auditor—Powers of Office.**

By the Constitution the State Auditor is made one of the executive officers of the state and is charged with the duty of faithfully executing all laws pertaining to his office, and is, therefore, not a mere ministerial officer.

**2. Same—Duties—Passing Upon Claims—Discretion.**

Under section 8066, Revised Laws 1910, the State Auditor is charged with the duty of examining and adjusting all claims against the state before issuing a warrant therefor, and by not defining the manner of examination nor the extent of adjustment the State Auditor is left to the exercise of his own judgment in the discharge of his duties and is held responsible, under the law, for failure to fulfill his duties.

**3. Same—Investigation of Claims—Statute.**

The proviso in section 8066: "Provided, that before issuing warrant in payment of any claim or account, the auditor may require additional information, and he may call, swear and examine claimants and others witnesses in reference to any claim or account presented to him"—is not mandatory nor compulsory upon the auditor, but is merely a grant of authority to him, intended to aid him in acquiring additional information should he be in need of additional information, and is not intended as a benefit to the claimant nor to grant power to the claimant to compel the auditor to acquire additional information where he already has sufficient information.

**4. Same—Power to Reject Claim.**

In the examination and adjustment of a claim against the state the auditor is not limited to the mere matter of form or the mere matter of correctness of addition of the items, but has authority to reject a claim altogether, if he knows it to be illegal.

**5. Same—Purpose of Statute.**

The primary purpose of the law is not merely to require that claims be made out in a certain form approved in a certain manner, but the primary purpose is to prevent the issuance of warrants upon illegal claims.

**6. Same—Procedure.**

The law prescribes that claims be itemized, sworn to, and approved in a certain way in order that the State Auditor may be able to properly examine and adjust the same, and upon his examination and adjustment and upon his issuance of a warrant in conformity with the provisions of the statute, the state, under section 8069, pledges its credit for the redemption of such warrant.

**7. Same—Nature of Office.**

The auditor is the state's accountant, and the state looks to him for a correct accounting of the state's funds and holds him responsible for failure to correctly account for such funds.

**8. Same—Abuse of Discretion—Remedy.**

The State Auditor is not authorized by law to act capriciously or arbitrarily or with abuse of discretion in the adjustment of a claim; the law pre-supposes that he will act with fairness and in honest, good faith, but, in case he does act capriciously or arbitrarily or with abuse of discretion as to a claim, the remedy of the claimant is by resort to the equity powers of the courts, and the court will examine the facts and grant such relief as in its judgment the claimant should receive.

In such case the courts do not assume to control the discretion of the auditor, but,

under the equity powers conferred by the Constitution, merely direct the auditor to execute the judgment of the court.

9. **Same—Conflict of Authority—Board of Public Affairs.**

Article 4, chapter 75, Revised Laws 1910, in creating the Board of Public Affairs and prescribing its duties and powers, and the subsequent acts of chapter 162, Sess. Laws 1915, and chapter 274, Sess. Laws 1919, conferring additional power on the Board of Affairs, do not take from the State Auditor any of the constitutional or ystatutor powers which he had before the creation of the Board of Affairs, nor do they authorize any conflict of authority between the Board of Affairs and State Auditor.

10. **Same—Jurisdiction of State Game Preserves—Contracts—Expense Claims.**

The departments of State Auditor and State Board of Public Affairs are co-ordinate departments in our system of state government, and the authority of each is confined within its own particular sphere, and the law is so framed that each of such departments may fully discharge its duties without conflicting with the authority of the other.

Record examined, and held, that the State Board of Affairs has jurisdiction of the State Game Preserves and the letting of contracts involved herein and is authorized to incur the character of expenses involved herein, and that the trial court was in error in holding that the Board of Affairs was without authority to incur the expenses involved.

11. **Appeal and Error—Review of Equity Case—Judgment.**

In an equity case this court will weigh the evidence, and if, in its judgment, the judgment of the trial court be against the clear weight of the evidence, then this court will render such judgment as should have been rendered by the trial court.

Error from District Court, Oklahoma County; Edward Dewes Oldfield, Judge.

Action by George F. Clark, member of the State Board of Public Affairs, against Frank C. Carter, as State Auditor, for a writ of mandamus to compel said Frank C. Carter, as auditor, to allow a claim of said George F. Clark and to issue warrant therefor for traveling expenses incurred by said George F. Clark in the discharge of his duties as a member of the State Board of Affairs. Writ denied, and plaintiff brings error. Reversed, and judgment upon the facts rendered in opinion by KANE, J.

George B. Rittenhouse, for plaintiff in error.

N. W. Gore and Thos. P. McDonnell, for defendant in error.

HARRISON, C. J. This was an action in the district court of Oklahoma county by George F. Clark, a member of the State Board of Public Affairs, against Frank C. Carter, as State Auditor, for a writ of mandamus to compel said Frank C. Carter, as auditor, to allow a claim of said George F. Clark and to issue warrant therefor for traveling expenses incurred by said George F. Clark in the discharge of his duties as a member of the State Board of Public Affairs. Upon the hearing the trial court denied the writ, and claimant, George F. Clark, has appealed from the order of denial to this court.

These questions of law are presented, which, together are determinative of the case: First, whether, under the law, the State Auditor is vested with any discretion in the auditing or allowance of a claim against the state, or whether his duties are purely ministerial and when a claim is presented in proper form, he has no other duty than to audit it and issue a warrant therefor. Second, if he has any discretion at all, do the facts in the case at bar show that he has abused such discretion in refusing to allow the claim and to issue a warrant for the same? Third, if he has abused his discretion, then what is the claimant's remedy?

In this opinion our purpose is only to interpret and declare the law which governs the case. As to the first proposition, sections 8065 and 8066, Revised Laws of 1910, are as follows:

"Sec. 8065. All claims or accounts against this state which by law are to be paid from the funds of the state by virtue of appropriation made by the Legislature shall be itemized and sworn to as just, correct, due, and according to law, and shall be signed as approved by the officer having control of the department or institution incurring such indebtedness, under such rules and regulations as may be by them prescribed, and shall be filed with the State Auditor; Provided, that any officer or employe of the state who shall certify or indorse his approval on any unjust or improper claim or account against this state shall be deemed guilty of malfeasance in office, and upon conviction thereof shall be punished as prescribed by law.

"Sec. 8066. All accounts or claims against the state which shall be by law directed to be paid out of the treasury thereof shall be presented to the auditor, who shall examine and adjust the same, and, for the sums which shall be found due from the state, shall issue warrants payable at the state treasury, which shall be numbered consecutively, and each warrant shall

specify the date of its issue and the name of the person to whom payable, and corresponding thereto, shall be entered upon a stub for each warrant separately, and such stub shall be preserved by the auditor in his office: Provided, that before issuing warrant in payment of any claim or account, the auditor may require additional information, and he may call, swear and examine claimants and other witnesses in reference to any claim or account presented to him."

The foregoing sections plainly impose a duty upon the State Auditor which, in my opinion, calls for the exercise of at least some degree of discretion. Section 8066 provides that "all claims against the state * * * shall be presented to the auditor, who shall examine and adjust the same;" and the further provision that before issuing a warrant in payment of any claim, the auditor may require additional information and may call and swear witnesses in reference to any claim. This, it seems to me, is intended to vest him with some degree of discretion in the matter of whether he should issue a warrant against a state fund.

Section 8065 provides that all claims or accounts which by law are to be paid from the funds of the state by virtue of appropriation made by the Legislature, shall be itemized and sworn to as just, correct, due, and according to law and shall be signed as approved—not ordered to be paid by the officer having control of the department, but merely signed as approved by such officer—and shall then be filed with the auditor—not allowed by the auditor, but filed with the auditor. It does not say that the auditor shall thereupon audit said claim and issue a warrant for same, nor does it say such claim, being itemized and sworn to as just, correct, due, and according to law and being approved by the officer having control of the department, shall even be prima facie evidence of its validity or its correctness, nor does it say that a claim thus itemized, sworn to, and approved and being in all things regular on its face, shall be conclusive evidence to the auditor of its validity and correctness, and that it is a claim which by law is to be paid from funds of the state by virtue of appropriations made by the Legislature; it merely says, "Shall be filed with the State Auditor," and says no more in that connection. This section does not say that the claimant, or the officer in control of the department which incurred the indebtedness, has any further duty or is vested with any further authority or is given any other rights. It is merely to be filed with the auditor; that

is, left with him and indorsed by him as filed on the date, etc. This section in itself does not require anything further to be done by either the auditor or the claimant. It is merely filed with the auditor; left with him to take such action as the law prescribes he shall take. And the next section, 8066, prescribes what action he shall take. It says, "The auditor * * * shall examine and adjust the same, and for the sums * * * found due * * * shall issue warrants," etc. It does not say how far he **may** examine it, nor to what extent he **shall** examine it, but the reasonable inference is that he may examine it to such extent as to enable him to **adjust** it. The statute makes it his duty both to examine and adjust a claim, both of which duties necessarily call for the exercise of judgment—discretion. It does not say how he may or shall examine a claim, nor how far he may or shall adjust one, but the reasonable inference would be that he may adjust it in such manner and to such extent as to determine whether it is a valid charge against the state before he shall be authorized to issue a warrant. And in order that he may fully satisfy himself, if he requires additional information as to its correctness or validity, his scope of authority is expressly enlarged by the proviso at the close of section 8066, supra, in order that he may be fully satisfied. What purpose could there be in requiring him to examine and to adjust a claim and in expressly enlarging his scope of authority in acquiring further information if he has no discretion after obtaining the additional information? If, when a claim is itemized and sworn to and is approved and filed with him, he has no further duty but to audit the claim and issue warrant therefor?

To review the question from a different angle, this section imposes a positive duty upon him without defining the extent of such duty or prescribing how it shall be exercised. Obviously, then, it is left to him to determine the extent of his duty and the manner in which it shall be performed. The section plainly says he **shall examine and adjust all claims,** and for the amount he finds due shall issue a warrant, etc. It makes it his duty both to examine and to adjust a claim, and by not prescribing how he shall examine it and by not prescribing the extent to which he may adjust it he must necessarily use his own judgment in performing the duty thus imposed upon him and is left to be the judge as to when he has fulfilled such duty.

This would not be true if the statute de-

fined the extent of his authority or the manner of exercising it or pointed out the extent to which he might adjust a claim after having examined it; but the statute does neither. Though it places an affirmative duty upon him, it leaves him to be the judge of his duty and holds him responsible under the penalties of impeachment and criminal prosecution for failure to fulfill his duties.

The contention that his duties are purely ministerial, that he is simply a ministerial officer and that when a claim is duly itemized, accurately added, made out in proper form, sworn to according to law and approved by the officer in control of the department which incurred the expense and is presented to him, he has no further duty than to issue a warrant for it, is not supported by the statutes. In fact, there is not one word of statute which supports such view. It is admitted that if there should be a mistake in the addition of a claim, the auditor might be authorized to correct it, or if a claim should not be made out in proper form, he might correct it in this respect, or if it should not be sworn to as the law requires, he might require that it be properly verified; but it is urged that he can go no farther than this; that it is not his duty and he has no authority to do more than to determine whether a claim is correct in amount, has been properly itemized and sworn to and made out in proper form and approved by the officer at the head of the department.

In answer to this contention we repeat, there is not one word in the statutes which supports such view, for if the heads of the various state departments, the Board of Affairs in this particular case, have power to prescribe to the State Auditor the forms on which claims shall be made out, the manner in which they shall be itemized and sworn to, and have control over the funds of the state and the auditing of claims against such funds and have approved a claim as a valid and proper one, then what authority has the auditor to question it in any particular? What right has he to object to the form of a claim or its verification or its approval or the correctness of its addition, if the officer in control, the Board of Affairs in this case, has approved it? Or what authority has he to object to a claim in any particular, if he has no authority to reject it altogether, if he finds it defective in all respects? Or what authority has he to refuse to issue a warrant for a claim which he knows to be utterly invalid, if the department in question has absolute control over the funds appropriated to its use and for its benefit? The inconsistency of the two propositions reveal their total lack of reason.

It is a mistaken view that the State Auditor is merely a ministerial officer and that his duties are purely ministerial. Section 1, article 6, of the Constitution makes the State Auditor a part of the executive power of the state government and makes him one of the executive officers of the state and vests him with a part of the executive authority of the state. It makes it his duty to see that the law, especially the law pertaining to his office and his duties, is faithfully executed. He is charged with knowledge of the duties imposed upon him by law, and charged with the duties of enforcing and executing such laws as pertain to his duties, among which is the duty of keeping an account of all funds of the state, and to see that no claim is charged against any of such funds and no warrants issued in payment of any claim that is not a valid charge against a fund duly appropriated by the Legislature. This is his primary duty as the state's accountant.

The Constitution makes him an executive officer of the state, and article 3, chapter 75, Revised Laws 1910, makes him the state's accountant as to all of the state's funds. It makes him the keeper of the state's accounts of funds and the guardian of such accounts. The state looks to the auditor, and to no other, as the keeper and guardian of its accounts and funds. It is true, the statutes provide that heads of departments shall not exceed the amount of funds appropriated for a particular purpose, and provide penalties against them for approving an illegal claim, but, notwithstanding this, the state still holds the auditor responsible for issuing a warrant for an illegal claim.

Sections 8065 and 8066, supra, and 8068, Revised Laws 1910, prescribe how a warrant against the state's funds may be obtained, and section 8069 says:

"For the redemption of all warrants issued in conformity with the provisions of this article, the credit of the state is hereby pledged."

Thus the duties pertaining to his office and the enforcement of the law in reference to the manner or method of obtaining a warrant against the state funds is confined to the State Auditor to the extent that when he has issued a warrant in conformity with the provisions of said article 3, the credit of the state is pledged for the redemption of such warrant.

The state looks to the auditor, and not to any other officer, to determine whether a warrant has been issued in conformity with the law, and the state holds him responsible for the allowance of an illegal claim and the issuance of an invalid warrant. Hence, to divest him of discretion in the allowance of claims and issuance of warrants would be to prohibit him from performing the plain duties imposed upon him by law.

The question whether a claim is properly itemized, made out in a particular form, and sworn to in a particular manner and approved by the officer in control of the department is not the primary purpose which the statute has in making it the auditor's duty to examine and adjust a claim. The primary purpose of the law is to prevent the allowance of illegal claims. The matter of form in which a claim may be presented is not the primary purpose of the statute. The primary purpose of the statute is to guard the funds of the state against illegal claims, and the auditor is made the guardian of the accounts of such funds. And the state will not pledge its credit for the redemption of any warrant unless it has been issued by the State Auditor.

With reference to the State Board of Public Affairs in this particular case, and in reference to the powers of the State Board of Affairs generally, there appears to be an unjustified confusion as to whether the Board of Affairs or the State Auditor has control of the funds against which this claim was made. This confusion seems to have grown out of the fact that article 4, chapter 75, Revised Laws 1910, created the Board of Public Affairs and provided for members' salaries and for the payment of necessary expenses actually incurred by them in the discharge of their duties, and prescribed their duties pertaining to the supervision of state buildings and state property and the purchasing of supplies, furniture, and implements needed by any of the departments of the state, or officers of the state, in the discharge of their respective duties, and made the board the supervisor and custodian of all state property and made it, the Board of Affairs, the purchasing agent for all supplies, including stationery, printing, stamps, etc., needed by any of the departments of the state or officers of the state in the discharge of their duties, and charged the Board of Affairs with the duty of keeping an account of all property belonging to the state, and provided that all claims against the state for

any of the items mentioned in said article shall be presented to the Board of Affairs in the form required by said Board of Affairs and be audited and approved by said board under such rules and regulations as it may prescribe.

While it is true that under said article 4, chapter 75, supra, all state property, not state funds, let it be borne in mind, but all state property—consisting of buildings, furniture, supplies, tools, implements, etc., the distribution of office room and assignment of floor space to different departments and officers, and management of state buildings, etc., are all placed under the control of the Board of Affairs, and the letting of all state contracts and the purchasing of all state supplies needed by any of the departments or officers in the discharge of their duties is to be done through the Board of Affairs, yet this does not give the Board of Affairs control over the funds of the state, nor control over warrants issued against the funds of the state, nor does it give such board control over all claims against the state. Many claims against the state are not required to be approved by the Board of Affairs, as officers' salaries, traveling expenses, and many others not required to be approved by the Board of Affairs.

The purpose of the act in creating the Board of Affairs was to make it the purchasing agent as to all state supplies and to require all supplies, furniture and implements, etc., to be purchased through the Board of Affairs, thereby insuring better contracts and closer attention to the prices paid for supplies. All supplies are to be purchased through the Board of Affairs. This applies to every department of the state and to every officer of the state, and when in need of supplies a requisition is to be filed with the Board of Affairs, which is authorized to contract for the delivery of such supplies to the department in need of same. It does not go buy the supplies and pay for them, but merely contracts for their delivery at a certain price; then the person from whom such supplies are purchased is required to file a claim with the Board of Affairs for the price of such supplies; such claim must be filed upon the forms and in the manner and under the regulations prescribed by the Board of Affairs and must be audited and approved by the Board of Affairs, but after such claim has been approved by the Board of Affairs, then its power over that claim has ceased, and the claimant, whoever he may be, must go to the auditor and get his warrant

against the state through the State Auditor. The board does not pay the claim, and has no power to pay for same, or to compel the State Auditor to issue a warrant for same but the supply company, after receiving the approval of the Board of Affairs, must then present its claim to the State Auditor for his warrant. But the fact that the Board of Affairs has the duty of purchasing supplies and fixing the price and the duty to audit the claim and duty to approve same, in order that the claim may be no greater than the price agreed to be paid, does not give it authority to say to the State Auditor when to issue a warrant.

The only difference in the law now and what it was before the Board of Affairs was created is that each department might purchase its own supplies under the former law, if it had funds appropriated with which to pay for same, while at present each department makes its requisition to the Board of Affairs and the Board of Affairs purchases all supplies and the claimant, the party from whom supplies are purchased, must now procure the approval of the Board of Affairs before it goes to the State Auditor. But we are unable to see wherein these requirements justify the contention that the auditing and approval of a claim by the Board of Affairs makes such claim ipso facto a valid claim against the state. We are unable to see wherein these requirements or wherein the authority conferred upon the Board of Affairs takes any authority away from the State Auditor. The only authority that it takes from any state officer is the authority to contract for and purchase his own supplies. But every claim for supplies, no matter whether purchased by the Board of Affairs or by whom, must be still presented to the State Auditor, examined and adjusted by him, before a warrant shall issue. Even the claim of a member of the Board of Affairs or his salary must stand upon the same footing that a claim for any other state officer's salary must stand.

Chapter 162, Sess. Laws 1917, and especially section 2 of said chapter, is cited to show that the Board of Affairs is given authority to purchase and acquire game preserves and to purchase all supplies and let all contracts pertaining to same; but this chapter gives the State Board of Affairs no further authority than the Game and Fish Commission had before such authority was transferred. The only change made is that a claim of any kind must now be approved by the Board of Affairs instead of by the Game and Fish Commission,

as formerly provided. It has taken no authority away from the State Auditor, and means no more than that the Board of Affairs shall present its claim for salary or expenses, duly itemized, sworn to, and approved, the same as any other officer of the state must do before a warrant will be issued by the State Auditor. The Board of Affairs has no further authority as to the issuance of a warrant for its salary and expenses than the Attorney General, the Secretary of State, or any other department has as to the payment of its salary and expenses; all must stand upon the same footing, and the statue makes the State Auditor the state's accountant of the funds of the state and holds the auditor responsible for the proper accounting for such funds.

It is true the statute makes provision for holding the officer in control of any department responsible for the approval of invalid claims and provides penalties for their so doing, but such fact does not lessen the auditor's responsibility for issuing a warrant upon an illegal claim. Hence, we can see no merit in the contention that because article 4, chapter 75, Revised Laws 1910, has given the Board of Affairs control and supervision over all state property in buildings, office room, etc., and has made such Board of Affairs the purchasing agent of the state in the purchasing of all state supplies, and chapter 162, Sess. Laws 1915, took away the powers which the Game Commission theretofore had and gave such power to the Board of Affairs, or the fact that chapter 274, Sess. Laws 1919, made an appropriation of $10,000 for the purpose of paying the expenses of the Board of Affairs in discharging the duties conferred upon it by said chapter 162—that these facts give the Board of Affairs any control over the action of the State Auditor in the issuance of warrants. Each department of the state has an appropriation for the purpose of paying the expenses of such department necessarily incurred in the discharge of its duties. But the Board of Affairs is given no further control over the funds appropriated for its expenses than any other department has over the fund appropriated for its expenses. The Board of Affairs does not have the approval of the traveling expenses or hotel expenses of any other department. The only character of claims of which it has the approval is for things purchased for or contracted for by the state. It is given certain definite powers with reference to purchasing all things needed by the state and with reference to contracts made on behalf of the state, but its

powers in this regard are over the claimants, the persons from whom purchases have been made, or with whom contracts have been made, and not over the State Auditor. The State Auditor has the same powers with reference to the issuance of warrants that he had before the creation of the Board of Affairs and the Board of Affairs has no more authoity or control over the actions of the State Auditor than any other department has, except that if the State Auditor be in need of supplies, books, stationery, stamps, desks, or supplies of any character, he must make requisition upon the Board of Affairs, the same as any other department, and the Board of Affairs purchases such supplies for the auditor, and the man from whom they are purchased must go through the same procedure with the Board of Affairs that any other claimant does for supplies purchased for any other department officer. And, with this exception, the Board of Affairs has no further control over the actions of the State Auditor than any other department officer has.

The State Auditor and every other department officer must purchase their supplies through the Board of Affairs and in the manner and form and under the regulations prescribed by the Board of Affairs and the claims for such supplies must be presented to the Board of Affairs for its auditing, examination, and approval, before the auditor is authorized to issue a warrant, but this fact does not imply that because of such approval the auditor is compelled to issue a warrant. The State Auditor is placed upon the same footing in the matter of purchasing his supplies that every other state department is placed, and the State Board of Affairs is placed upon the same footing, and upon no more advantageous footing, as to claims for its expenses, than any other department as to claims for its expenses. They must all be examined and adjusted by the auditor before a warrant will be issued, and must be examined and adjusted by the Auditor in substantial conformity with sections 8065 and 8066, supra, before the state will pledge its credit for the redemption of such warrant. It is upon the auditor's examination and adjustment that the state bases its pledge of redemption, and not upon the examination and adjustment or approval of any other department.

The Constitution makes the State Auditor an executive officer of the state, and the Legislature has made him the state's accountant of all funds of the state and imposes certain positive duties upon

him with reference to issuing warrants against the state, and by failing to define the limits of his duties and to prescribe the manner of their performance he is left to his own judgment in the discharge of his duties thus imposed, and the courts will not interfere with his discretion unless it be made to appear that he has abused his discretion. By this are we not to be understood as holding that the auditor may act arbitrarily or capriciously. The law does not authorize the auditor to act capriciously or arbitrarily, nor does it contemplate that he will abuse the discretion vested in him. The law presupposes that he will not exceed his authority or abuse his discretion, but will act with fairness and in honest, good faith in the fulfillment of his duties. But in case he should act capriciously or arbitrarily, or should exceed his authority or abuse his discretion, then the law authorizes this court, in the excerise of its equity powers, to correct such abuse and grant such relief to the aggrieved party as he may be entitled to receive.

There is one other contention made with reference to his duties under section 8066, which we think is not sustained by the law, viz., the proviso at the end of section 8066, which authorizes the State Auditor to acquire additional information by swearing witnesses, etc., where he feels the need of additional information. It is contended that this proviso makes it his duty to call witnesses and examine them, and that such duty is intended to benefit and is for the benefit of the claimant. This view is not sustained by the statute. The statute says he may acquire. May acquire what? Additional information. It does not say he shall acquire it for the benefit of claimant; it does not say that the claimant has authority to demand him to acquire it. It does not expressly say for whose benefit it may be acquired, but it says he may acquire additional information. There would be no need of additional information if he already had sufficient information; if he already has sufficient information to satisfy him that a claim is illegal, then the claimant is not given any authority to compel him to acquire additional information.

It appears to us that the only reasonable inference, the only reasonable construction, is that he may acquire additional information if he thinks he needs it, and is not compelled to acquire any additional information if he already has sufficient information.

Another question of law is incidentally involved which, we think, is proper to determine, to wit: The trial court held that

the Board of Affairs had no jurisdiction over the letting of contracts for which these expenses were incurred and no authority for incurring the expenses involved herein. In this the trial court was in error. The statute above referred to expressly gives the jurisdiction of such matters to the Board of Affairs and provides for the payment of the expenses of the Board of Affairs in the discharge of its duties; hence, the court was in error in holding, as a matter of law, that it had no authority to incur the expenses involved herein.

To summarize the proposition involved: We hold that the State Auditor is vested with discretion with reference to issuing warrants against the state funds; that the courts cannot control such discretion; that in case he should arbitrarily refuse to issue a warrant for a claim which in all respects is valid, the court will thereupon grant relief to the claimant and direct the auditor by proper writ to issue a warrant. In such case the court does not control the discretion of the auditor, but simply in the exercise of its higher equity powers directs the auditor to execute the judgment of the court.

Courts will not assume to control the discretion of executive department officers or inferior tribunals, nor attempt to divest such officers or tribunals of the discretion given them by law; but where it is made to appear that an executive officer or inferior tribunal has acted arbitrarily and has abused its discretion, this court, in such case, by virtue of the equity powers conferred upon it by the Constitution, will grant relief to the parties aggrieved and direct such officer or inferior tribunal to carry into effect the judgment of this court, based upon the facts and circumstances in the case. Also, in an equity case, this court will reverse the judgment of the trial court where it appears to be against the clear weight of the evidence, and will render such judgment as should have been rendered by the court below. Tulsa v. Purdy, 73 Oklahoma, 174 Pac. 759.

This, in our opinion, is the law which governs this case. Under this pronouncement friction and conflict among the departments of state in the exercise of their respective powers and in the discharge of their respective duties may be avoided. The law does not intend that there shall be conflict. The purpose of the law is to provide a system of state government consisting of separate, co-ordinate departments, each charged with specific duties and vested with authority to discharge such duties, each department acting within its particular sphere without conflicting with the duties or authority of other departments, and yet each constituting a necessary factor in the entire system of state government. To this end the law has made adequate provision and this object attained when the provisions of the law are rightfully interpreted.

The conclusion of the court as to the facts and weight of the evidence in this case is expressed in the opinion of Mr. Justice Kane, which become the judgment of this court as to the facts, and proper mandate will thereupon be issued.

The writer hereof does not concur in the conclusions of the majority of the court as to the facts, but delivers herein the majority opinion as to the governing principles of law.

Reversed and judgment upon the facts rendered in opinion by KANE, J.

MILLER, ELTING, KENNAMER, and NICHOLSON, JJ., concur in this opinion as to law.

Reporter's Note: The opinion of Mr. Justice Kane referred to herein was never handed down, for the reason that the answer to the writ of mandamus showed there were no funds appropriated to pay the claim in question. It was a claim which the majority of the court thought should be paid, but the opinion holding that way was not handed down for the reason there were no funds.

ELTING, J. (concurring). The writer of this concurring opinion concurs in the law defining the powers and duties of the State Auditor under the Constitution and laws of this state pertaining to the office of State Auditor, as set out in the opinion by Mr. Chief Justice Harrison, and dissents from the opinion by Mr. Justice Kane wherein it expresses the law different as pertaining to the powers and duties of the State Auditor, but does not concur in the conclusion by Mr. Chief Justice Harrison wherein he holds that the judgment of the trial court is not against the clear weight of the evidence, but does concur in the conclusion in the opinion by Mr. Justice Kane, wherein said opinion holds that the judgment of the trial court denying a writ of mandamus is clearly against the weight of the evidence and that the writ of mandamus should issue.

I do concur in the holding in the opinion by Mr. Justice Kane wherein it is held that the Board of Affairs does not have statutory authority in the letting of contracts pertaining to game preserves, such as fencing the same, and letting of contracts for the

state generally. The statutes expressly make the Board of Affairs the contracting agent of the state, and the trial court was in error when it held to the contrary. In fact, there in nothing in the opinion by Mr. Chief Justice Harrison holding to the contrary on this proposition, but in fact it holds that the Board of Affairs has this authority.

The writer of this concurring opinion thinks that his position in this case is such that it is advisable that he give the reasons for his position in the case.

The writer has reviewed the record made in the trial court in this case very carefully, and he has come to the conclusion that the judgment of the trial court refusing the writ of mandamus is clearly against the weight of the evidence. In investigating the record the writer has sought to divest himself of any predilections or preconceived ideas that may have existed in his mind and has labored with an eye single to arrive at what the record shows. It is always the duty of the court to arrive at what the record expresses. It is probably idealism to say that this is always done, but the strength and weight of an opinion lies in the degree to which this idea is approached.

The issues in the trial court were pitched in the pleadings of the plaintiff and defendant, and are as follows: The plaintiff below, plaintiff in error herein, George F. Clark, assumed the burden in his pleadings, and in his proofs, to show that his claim for $43.32 was a legal, just, and proper claim and that the refusal of the State Auditor, F. C. Carter, to allow this claim was unreasonable and arbitrary. The claimant, George F. Clark, in addition to assuming the burden in his pleadings and proofs of showing that his claim was prima facie legal and proper, also assumed the burden of refuting the reasons given by the State Auditor for disallowing the claim.

The reasons stated by the State Auditor for disallowing said claim were based upon three grounds: First. That the claim of the plaintiff in error was illegal for the reason that it was contracted as expense in the performance of a duty that did not devolve upon the State Board of Affairs, of which the plaintiff in error was a member. Second. That said claim was fraudulent for the reason that the project upon which the Board of Affairs, together with the Fish and Game Commission, embarked, namely, the advertising and letting of contracts at the town of Smithville for the fencing of the game preserve near Smithville, was not a project in good faith and not in the line of

their duty to promote the interests of the state and the people thereof, and that it was only such ostensibly, while in fact and in truth, it was a junketing project, promoted at the expense of the state. Third. That the claim was not presented in the form required by law, and that the receipts and vouchers in support thereof, as charged in the defendant in error's pleadings, were not signed by the parties it is purported signed the receipts.

We will now discuss the proofs adduced by the plaintiff in error in support of the prima facie force of his claim and in refutation of the above charges by the State Auditor. The proofs of the plaintiff show a requisition upon the State Board of Affairs by the game and fish department, for the letting of a contract for the fencing of a game preserve in the Kiamichi mountains near Smithville. The advertisements were made and the 24th day of May, 1920, was set as the day for letting the contracts for the purpose of fencing the game preserve near Smithville. The record shows that some of the bills for some of the preliminary expenses and expenditures were presented and allowed by the State Auditor, and the record shows that all of the preliminary steps taken in this case were the usual steps pursued by the Board of Affairs in the letting of contracts.

It has already been held that this action by the Board of Affairs was in the line of their duty as defined by the statutes. It has been suggested in the briefs and in the record that it was an unusual act on the part of the Board of Affairs to set the place of receiving bids at such an out-of-the-way place as Smithville and that the same should have been set and done at the State Capitol.

At this point we desire to insert this suggestion, which we think is not inconsistent with the law as announced by the court in this case. The law does not require the Board of Affairs to let their contracts from the State Capitol, and the fact that in the instant case the Board of Affairs did not see fit to let the contract from the State Capitol, but saw fit to let it from somewhere else, is not of itself sufficient to invalidate a claim for expenses connected with such letting, and the action of the Board of Affairs in this behalf is attended with the same presumption of good faith as attends the State Auditor in the performance of the duties of his office. The executive departments of the state government are co-ordinate, and no one department has the right to control and direct the policies of any

other department and when any department in the performance of its duties becomes related with another department and those relations are handled by any department in such a manner that the manifest effect would be that of controlling, or at least influencing, the policy of the other department, such actions must be held to be arbitrary and unreasonable.

The plaintiff in error assumed the burden of showing, by witnesses, the reasons why the bids were let at Smithville. The evidence shows that the Board of Affairs and certain members of the game and fish department had not seen the game preserve, did not know and understand the problems, physical and otherwise, that it was necessary for them to know, that they might properly dispose of the game.

Upon the question as to the purpose of setting the place for receiving the bids at Smithville and near the game preserve, it is explained in the following portion of the evidence of Mr. Watt, the Game Warden:

"Q. State your name. A. Ben Watt. Q. What position do you occupy? A. State Game Warden. Q. How long have you occupied that position, approximately? A. Since February a year ago. Q. Were you State and Game Warden in April and May, 1920? A. Yes, sir. Q. Mr. Watt, you are acquainted with this McCurtain game preserve, or the game preserve in McCurtain county, are you? A. Yes, sir. Q. Do you have that under your department? A. Yes, sir. Q. State if you have made any requisitions upon the Board of Affairs with reference to the purchase of land and the improvements thereof? A. Yes, sir. Q. Go ahead and state what you did? A. This tract of land that was bought was originally bought from the government, twenty sections. That was the first act of the Legislature appropriated so much money to buy a game preserve and they bought it from the government, twenty sections, and within that twenty sections were approximately a half a dozen sections that had already been sold to individuals. I can show you from this plat about how that was situated down there and the principal object that I had in it. It was a great big proposition and was mountain land, twenty-five or thirty thousand acres of land. Here is the twenty sections that was bought from the government that belonged to the Indians, and within the general boundary of this land there was considerable that had been sold in quarter sections to individuals. When I went in the Game Warden's office, I thought we owned all of these twenty sections. I found out that we did not have any title to these and I took up with these different parties, the purchase of this land. Through the Attorney General's office we

made requisition for money to pay for that quarter (indicating), that one (indicating), and that one (indicating), and it had been practically closed. I think the warrant for two of those had been issued. I had the warrant for two of them, and there is 40 acres up in there (indicating) that they don't want to sell. If we ever get it at all it will probably have to be by condemnation proceedings. Since I went into office. I went down and made an examination of its game preserve. I go there every month and stay four or five days and since we bought this, I went down there and when we got there, we found something unusual. We found Linson creek practically dried up. I came back and recommended to the Governor that unless we could get more land and some land with more water on the game preserve that I would not be in favor of fencing it. It would cost twenty-five or thirty thousand dollars to fence it and probably would have been some hole enough to have kept some water in it, some game, but you could hardly figure on it. It would not run and the holes were, may be, forty to fifty yards apart, so we took up with some people who had bought 2,850 acres of land here, which would give us about a mile and a half of Mountain Fork river, one of the best rivers in the country, that would make plenty of water to insure a game preserve. We obtained an offer for $14,400, and I made requisition on the State Board of Affairs and they closed the deal and I did work in that myself, with the Attorney General's office. We bought the south half of sections 3, 4, 5 and all of sections 8, 9, and 10, which gave us a mile and a half of Mountain Fork river. This land in here (indicating), will probably have to be condemned, and my idea was to have the Board make an inquiry and look over this property and see what they wanted to do. You see, your land runs across there and here and goes across Mountain Fork there (indicating), and leaves out this land entirely. It would take probably a year or two to get it through the court, and all of that. That was one of the principal reasons that I wanted them to go down there. Q. By them, who do you mean? A. The Board of Affairs, the Governor, and the Game Commission, which is composed of the Governor, Secretary of State, and the Game Warden. They had it advertised in this way, one to furnish the wire and another the posts and other to furnish the hauling. You see this is 30 miles from a railroad over rough mountain road, and another question was the erection of the fence itself, and I wanted them to see this land. There was lots of good timber on the land, lots of good oak, and whether it would be advisable to go on there and cut out the fence way and may be if they could get any other bidders, to take a crew of convicts and build the fence ourselves. I just wanted them to know as much about it as

I did without saying that I wanted to spend $30,000 or $40,000 without anybody knowing anything about it excepting what I told them. It would have been impossible for the Board of Affairs or for the Game Commission to have formed any sort of an idea of this game preserve without going on the land and seeing how far it was from a railroad and the facilities for getting to the game preserve and the facilities for getting stuff hauled. I had no idea until I went down and hired a horse and took a week to go over and find that we had no water and then we bought this and now we have, what I regard, as one of the best locations for game preserve in the United States. There is deer and turkey and water and everything they need. Q. Now, Mr. Watt are there other lands within that block that they bought from the government for a reserve, that is not owned by the state at this time? A. There are three or four quarter sections in there. Q. I will ask you this. What was the purpose of the Board of Affairs in going down there other than to receive these bids for fencing, if you know? A. All I could say would be what I said to them myself. The reasons that I gave them for it was that I did not believe anybody who would make a bid on it, would make a bid for less than $10,000 or $15,000 more than it was worth to cover the contingency of making water gates and crossings on the streams. I wanted anybody who bid, to know how far it was from the railroad and what it would cost to get the stuff there and how he could fence it. I did not want anyone to take it without knowing that he could make good the bid, so we decided to cut it into concrete propositions as to what the wire would cost, and what the posts would cost, and what the erection of the fence would cost. Nobody bid on it as a whole, excepting, I believe, one man made a bid to take it and build it for ten per cent. of the actual cost. Q. You mean cost plus ten per cent? A. Yes; and I said that I would not make contract myself where the more you spent the more I would get, and now we have a proposition as to what the wire will cost per mile and what the posts will cost per mile and what the erection of the fence will cost per mile, and so far as fencing the game preserve, I don't know what others think of it, but as long as I stay in as warden, I will make an effort to fence the reserve because I think we have it in shape where we have the money to fence it and I don't think we could ever have gotten it unless we had the Board of Affairs to examine the land and anyone who had anything to do with the control of the money to go there and see it. I don't believe that you could sit here and put it over in ten years. You could not talk to a man and tell him enough about it for him to form a reasonable bid. Mountain land is different. Some places it is rock and will

cost two dollars a hole to put down the post hole, may be for a mile, and then again it might not cost over 25 cents at other places. I wanted them to see it, and even then, they didn't see it. I was there four days ahead of those people, and I don't think there was seven hours in the day that I was not busy going over the proposition with them people to get them to understand what we wanted. We wanted 88-inch woven wire fence with posts not more than a rod apart and at least every four rods we wanted a post that would hold the entire fence up and then, if we wanted to take oak posts in between that would last four or five years then we could take them out and still have a fence that would stand."

The reasons of the Game Warden are apparently good reasons, and at least make a prima facie showing, and being unrefuted in this record, as we view it, are binding upon this court.

We will now discuss the evidence bearing upon the second proposition; that is, as to the junketing trip. The defendant in error, F. C. Carter, upon the witness stand, was asked how he knew it was a junketing trip. In answer thereto he stated in substance: Because he was invited to go himself by Mr. Bird, a member of the Board of Affairs; and furthermore stated in substance that he knew it was a junketing trip because he had heard it discussed by parties who intended to go.

It is possible that some features of a junketing trip may grow out of and be connected with many projects. But the fact that such features may be connected with it would not of itself be sufficient to illegalize and make fraudulent such a project. And it is reasonable to infer from this evidence that the timely warning given by the upstanding auditor that any claims presented would be disallowed probably had the wholesome effect of preventing what might have otherwise been some junketing features connected with this project. But it is not in the mouth of this court to say that because some one who intended to go or did go for the purpose of pleasure, is of itself sufficient to invalidate a prima facie valid project and invalidate a claim of expense which prima facie appears legal and reasonable, and where the claimant is not shown to have gone for such a purpose, and where the specific proofs shows that he went for a valid purpose.

Some of the evidence offered upon the question of the junketing features of this so-called junketing project was that there was talk around the State Capitol that that

was the purpose of the trip; and one of the prospective junketers had gone so far as to get up a kit of camping supplies, among which were mentioned crates of eggs. By way of passing comment, we will suggest that the evidence in the record does not show that any of the shells were traced to the claimant in the instant case. The member of the Board of Affairs, Mr. Bird, the member of the board who talked with the defendant in error, the State Auditor, regarding the trip, did not accompany the party, and there is no evidence connecting the claimant in the instant case with the junketing phases of the project.

It must be borne in mind that this is a claim of the plaintiff in error, George F. Clark.

It might be suggested that bad faith is indicated by the fact that, after advertising the bids and making the trip down there, the Board of Affairs failed to let any contract. The following is a portion of the evidence of U. S. Russell, chief clerk of the Board of Affairs, given in the trial of this cause, and it is explanatory of the proceedings had at the meeting and bears upon the question of good faith of the transaction.

"Q. What was the next step you took with reference to the fencing of the game preserve? A. The Board of Affairs authorized to meet on the day set forth in the advertisement, May 24th, at Smithville, Okla. This was done at the request of the State Game Commission, who took the board to view the land and to let the bids at Smithville in order that they would promote local competition and that the natives in that country be given an opportunity to bid upon the posts, hauling the posts, digging the post holes, setting them and other features of that contract was cut up into sections to permit the natives of that country to benefit thereby and get competition. The bid for the wire alone was made a separate item. For that reason the board ordered the advertisement to call for session of the board at Smithville, Okla., the nearest post office to the state game preserve. Q. Did you keep the minutes of the board? A. Yes, sir. Q. And you have the minutes with you, have you? A. Yes, sir; I have copies. Q. Certified copies; is that what you hold in your hand the certified copy of the minutes? A. Yes, sir. Mr. Rittenhouse: I ask this paper be marked for identification, exhibit "I," and I offer the same in evidence. Mr. Gore. Objected to as incompetent, irrevelant, and immaterial. The Court: Overruled. Mr. Gore: Exceptions.

" 'I, U. S. Russell, chief clerk of the State Board of Public Affairs, on oath make the following statement:

" 'I, hereby, certify that the records of the State Board of Public Affairs show that upon recommendation of the State Game and Fish Warden the State Board of Public Affairs caused to be published a notice to contractors, a copy of which is hereto attached, and said notice to contractors was ordered published, for the general information of the public, in the following legal newspapers published in the state of OOklahoma:

" 'Order No. 22275 to the Daily News, Hugo Okla., authorized publication of said legal notice to contractors one time.

" 'Order No. 22274 to the Daily Tribune, Tulsa, Okla., authorized publication of said legal notice to contractors one time.

" 'Order No. 22273, to the Daily Oklahoman, Oklahoma City, Okla., authorized publication of said legal notice to contractors one time.

" 'Order No. 22276, to the Daily American, Fort Smith, Ark., authorized publication of said legal notice to contractors one time.

" 'All of the foregoing official board orders were issued under date of April 21, 1920.

" 'I further certify that in pursuance of the official notice to contractors referred to above the State Board of Public Affairs convened at Smithville, Okla., May 24, 1920, with Geo. F. Clark, chairman, and J. W. Kayser, vice chairman, present, same being a quorum of said State Board of Public Affairs, and that the notice to contactors was read and bids called for. Notification having been received that one bidder had left his proposal with the State Game Warden, who was then at the game preserve, and that said bidder desired to be heard in connection with said proposal, the Board of Public Affairs did then adjourn to give consideration to all proposals at a meeting to be held at the state game preserve.

" 'I further certify that the records of the State Board of Public Affairs show the following entry in the official minutes of the said State Board of Public Affairs:

" 'Smithville, Oklahoma, May 24, 1920.

" 'This being the day set for opening the bids for fencing the game preserve in McCurtain county, the board met in session and received bids from the American Steel Wire Company, the Hudson Wire & Iron Company, Paul C. Thorne, and the Long Bell Lumber Co. It appearing that Mr. Ben Watt, State Game Warden, had one of the bids at the game preserve, the board proceeded to that place and on Tuesday May 25th, opened all bids which were as follows:

" 'The bid of Paul C. Thorne on creosoted posts according to specifications was on the basis of cost plus ten per cent.

"'The bid of the Hudson Wire & Iron Company' on wire at $1.63 per rod, F. O. B. factory.'

"'The American Steel & Wire Company bid on wire $1.433 per rod for fence with stay wires twelve inches apart and $1,980 per rod with stay wires six inches apart, F. O. B. Pittsburg, Pa.

"'The Long Bell Lumber Company bid on creosoted posts at the rate of 17 cents per lineal foot.

"'Said bids were open and further consideration continued until June 1, 1920.

"'U. S. Russell,

"'Chief Clerk, State Board of Public Affairs.

"'(Seal.)

"'Subscribed and sworn to before me, this the_____ day of_____, 1920. My commission expires_____, 1920.

"Q. Did the Board of Affairs meet on June 1, 1920, pursuant to that adjournment? A. they did. Q. Have you a copy of the minutes of that meeting? A. I have. Q. Is that instrument you have in your hand a true copy of the minutes? A. It is. Q. It has your signature, has it, Mr. Russell? A. It has.

"Mr. Rittenhouse: We ask that this be marked as exhibit 'J' and offer the same in evidence. Mr. Gore: Objected to as incompetent, irrelevant and immaterial, being the meeting of the Board of Affairs alleged to have been had after this claim was filed. The Court: Overruled. Mr. Gore: Exceptions.

"'Plaintiff's Exhibit J.

"'Minutes June 1-20.

"'The matter of letting contract to fence the state game preserve in McCurtain county, having been continued on May 24th, was taken under consideration, and after hearing a report from the State Game Warden on a proposition made by a contractor who was delayed in viewing the premises, it was the judgment of the State Board of Public Affairs that the letting of a contract for fencing the said State Game Preserve in McCurtain county be postponed indefinitely, and it was so ordered.

"'I, U. S. Russell, Chief Clerk of the State Board of Public Affairs, do hereby certify that the above is a true copy of the minute entry of the said State Board of Public Affairs under date of June 1st, 1920. U. S. Russell, Chief Clerk, State Board of Public Affairs."

This evidence of the chief clerk of the board as to the proceedings of the board seems to be a satisfactory explanation as to why the board did not act and let the bids.

This record and explanation is not attacked or refuted and is, therefore, binding upon this court.

Upon the question as to whether this claim was presented in proper form and as the law requires, the record shows that it was made out on a regulation form and the one usually used in presenting claims. One of the specific objections to the claim by the State Auditor pertain to two items. One was the item of G. C. Johnson for auto hire. The receipt, the auditor claims, showed to have been raised from $5 to $10. Also as to the two items for auto hire by Will James for $10 each. The objection to these two items was that the receipt appeared to be signed by Will James in the claim presented by Clark, while in a claim filed by J. W. Kayser, another member of the State Board of Affairs, and disallowed by the State Auditor, there appears an item of Will James in this last named claim, for auto hire where Will James signs a receipt by his mark. The condition of these receipts, unexplained, would leave them under suspicion.

George F. Clark assumed the burden of explaining these items in the evidence given by himself, and states that he paid the actual money as shown by said receipts in both the Johnson and James items; that the charge in the Johnson item was for the actual money that he paid to Johnson, and that the two charges in the two James items were for actual money he paid James for his auto hire for his (Clark's) transportation, and that Will James could not write his name and that some one wrote his name to the receipt at the time the money was paid him. This evidence by the plaintiff in error undoubtedly makes prima facie showing for the good faith of these items and unrefuted, is binding upon this court, and we find nothing in the record in any way refuting this positive evidence of the claimant.

Thus were the issues joined, and thus were the issues met by the evidence. The law, as pertaining to the powers and duties of the State Auditor, as defined by the majority of this court, holds the auditor to be a checking officer upon claims against the state. He has the power and it is his duty to refuse to allow a claim that he is satisfied in his own mind is illegal or fraudulent and that he has the right to prescribe reasonable rules and methods of presenting claims to him for allowance. And in the event that he acts disallowing a claim, and the claimant feels that the auditor has acted in an arbitrary and unreasonable way, his remedy

is a proceeding in mandamus as in the instant case; and in such proceeding it then becomes the duty of the claimant to assume the burden of showing the arbitrary conduct of the auditor in disallowing his claim; and when the claimant has made prima facie showing of the validity and good faith of his claim, then the burden shifts to the State Auditor to show the illegality or the fraud of the claim, or both.

In the instant case, the auditor called upon the claimant to show for what purpose the expenditures were made. The answer of the claimant to this request was, in substance, that it was for expenses connected with the business of the Board of Affairs. This the auditor did not seem to regard as sufficient answer to his request. If the claimant had made such a showing in response to such request as is made in the record in the instant case, or anything approximating it, we can only conjecture as to what would have been the attitude of the State Auditor toward the claim; but it is our duty to presume that he would have acted in a reasonable way and would probably have allowed the claim.

The law, as contended by the minority opinion, on the law in this case, is that it was the duty of the auditor to take evidence upon the question as provided in the statute and to examine the claimant and other witnesses, and since he failed to do this, the claim should be taken as presumptively valid and bona fide. To this I do not agree; but do agree with the holding of the minority opinion on the law in this case that the provision as to examining witnesses is merely directory and the auditor can do this if he so decides, or he may satisfy himself in any other manner.

But when the State Auditor becomes the defendant in a mandamus proceeding and the question arises as to whether he has or has not acted in an arbitrary manner, then, in that proceeding, after the evidence on the part of the plaintiff becomes sufficient to shift the burden, it then becomes necessary that the State Auditor "place his cards on the table" and show the reasons for his action. Reasons within his own bosom cannot be considered by this court. It is only the evidence disclosed by the record and the probative force of the same that is presented therein under the rules of evidence, that should control this court in its decision.

The writer's view is that the State Auditor has failed in the instant case to make a sufficient showing in rebutting evidence of the claimant. and the writer thinks that

the judgment of the trial court in refusing the writ was clearly against the weight of the evidence.