No. 17,974.

ACE FLYING SERVICE, INC. *v.* COLORADO DEPARTMENT OF AGRICULTURE, ET AL.

(314 P. [2d] 278)

Decided August 12, 1957.

20

Mr. CHARLES F. KEEN, Mr. VINCENT CRISTIANO, Mr. ROBERT BUGDANOWITZ, for plaintiff in error.

Mr. DUKE W. DUNBAR, Attorney General, Mr. FRANK E. HICKEY, Deputy, Mr. SAMUEL R. FREEMAN, Assistant, for defendants in error.

*En Banc.*

MR. JUSTICE SUTTON delivered the opinion of the Court.

THIS action was brought by plaintiff in error, to whom we will refer as plaintiff, against defendants in error, to whom we will hereinafter refer as defendants, to re-

cover the loss allegedly sustained by it as a result of defendants' conduct in preventing the performance of a contract.

Plaintiff alleged in its complaint: That it entered into a written contract with defendants under which it agreed to spray 1,500,000 acres of range land in order to control a grasshopper infestation; that it was to receive 13¾ cents per acre for the work and materials to be used; that it submitted its bid of 13¾ cents per acre on the written assurance of defendants that the work to be done involved 1,500,000 acres of land, and the bid was submitted on that basis; that plaintiff procured and had available its agents, employees and requisite number of aircraft and stood ready at all times to perform the contract; that plaintiff in reliance on the contract borrowed money from banks for financing and preparing aircraft and personnel; that thereafter defendants, although ordering and requiring plaintiff to supply aircraft and personnel, failed to provide the necessary acreage for the fulfillment by plaintiff of its contract, but permitted it to spray only 240,000 acres, and paid it at the rate of 13¾ cents per acre for the area sprayed; that plaintiff had secured aircraft and personnel adequate to perform the contract in full, and effectively carried out its agreement as far as it was permitted to do so and was ready to perform in connection with the portion thereof which it was prevented, by defendants, from carrying out; that the Colorado legislature appropriated the sum of $200,000.00 for the payment of services which plaintiff contracted to perform and said sum was available to defendants for payment to plaintiff; that defendants failed to pay the sum due plaintiff, and it prays for judgment in the sum of $40,000.00.

Defendants, appearing by the Attorney General, filed their motion to quash, based on the proposition that as representatives of the State of Colorado they are immune from suit since the sovereign State of Colorado cannot be subjected to the processes of the courts with-

out its consent, and no such consent had been granted.

The trial court sustained the motion to quash, holding that such an action cannot be maintained without consent. The court relied upon opinions of this court antedating *Boxberger v. Highway Dept.*, 126 Colo. 438, 250 P. (2d) 1007, and *Highway Dept. v. Dawson,* 126 Colo. 490, 253 P. (2d) 593, and entered judgment dismissing the action.

*Sole Question To Be Determined:*

*Where the legislature of Colorado authorized the State Department of Agriculture to eradicate a grasshopper infestation and appropriated adequate funds to defray the expense thereof; and where the said Department, in complying with the legislative direction entered into a contract for services and the use of equipment in carrying out the program as directed; will the law imply a consent, by the state, to be sued on said contract if the other contracting party asserts a breach of the contract on the part of the state?*

This question is answered in the affirmative.

■ All contracts entered into by the State of Colorado or by any of the Departments in its behalf, are required to be awarded, pursuant to statute, to the lowest responsible bidder. Once entered into they are binding upon the state as well as upon the other contracting party. To hold that the state may enter into a contract by which the other party is compelled to expend large sums in acquiring material, machinery and personnel to enable it to perform its obligation, and then arbitrarily repudiate the contract relegating the injured party to the doubtful remedy of appealing to the legislature for justice in the form of a bill for relief, would be to sanction the highest type of governmental tyranny.

■ The applicable principle is that when a state enters into authorized contractual relations it thereby waives immunity from suit. This is not a new doctrine in this country. The Supreme Court of Indiana in 1891,

in the case of *Carr v. State,* 127 Ind. 204, 26 N.E. 778, made the following pertinent assertion:

"In entering into the contract it laid aside its attributes as a sovereign, and bound itself substantially as one of its citizens does when he enters into a contract. Its contracts are interpreted as the contracts of individuals are, and the law which measures individual rights and responsibilities measures, with few exceptions, those of a state whenever it enters into an ordinary business contract. * * * The principle that a state, in entering into a contract, binds itself substantially as an individual does under similar circumstances, necessarily carries with it the inseparable and subsidiary rule that it abrogates the power to annul or impair its own contract. It cannot be true that a state is bound by a contract, and yet be true that it has power to cast off its obligation and break its faith, since that would invoke the manifest contradiction that a state is bound and yet not bound by its obligation. * * * Hence it is that where there is no statute making an appropriation no action will lie against the officers of the state. *State v. Stanton,* 6 Wall. 50; *Hans v. Louisiana,* 24 Fed. Rep. 55. Whether an appropriation shall or shall not be made is a legislative question, and over purely legislative questions the courts have no supervision or control. A question of that character is beyond the touch of the judiciary, for one department of government cannot enter the domain of another. * * * The right of the relator to compel the auditing and payment of his claim must, it is evident, depend upon whether there is an appropriation on which a warrant can be rightfully drawn, and out of which it can be lawfully paid; * * *."

To like effect is the opinion of the Court of Appeals of Georgia in the case of *Regents of University System v. Blanton,* 49 Ga. App. 602, 176 S.E. 673, from which we quote the following:

"A state or any of its departments entering into contracts lays aside its attributes of sovereignty, and binds

itself substantially as one of its citizens does when he enters into a contract, and, in general, its contracts are interpreted as the contracts of individuals are, and are controlled by the same laws. *Ohio L. Ins. & Trust Co. v. Debolt,* 16 How. 416, 14 L.Ed. 997; notes, 42 L.R.A. (N.S.) 117. Where there is an act of the state legislature authorizing a contract by a state department, the courts have power to enforce the contract against the state. *Carr v. State,* 127 Ind. 204, 26 N.E. 778, 11 L.R.S. 370, 22 Am. St. Rep. 624, and notes."

From the opinion of the Supreme Court of Nebraska in the case of *Todd v. Board of Educational Lands and Funds,* 154 Nebr. 606, 48 N.W. (2d) 706, we quote the following:

"This is true of a lease made by the state. It, by entering into a contract, abandons its attributes of sovereignty and binds itself, to the extent of its power to contract, substantially as an individual does when he makes a contract. The state may not impair any of the substantial rights secured by its contract to a citizen with whom it contracts. * * * "

 The doctrine of sovereign immunity from suit has a historical basis steeped in antiquity and antedating the establishment of any organized government on this continent. Variations from it have usually been made only by *express* acts by the Congress of the United States or by state legislatures. The original basis for the existence of the doctrine under English common law was that the king or sovereign could do no wrong, was considered untouchable and above the law. Later in the democracies it was recognized that to permit suits against the state would result in the depletion of its treasury and of tax funds necessary for the operation of the government on behalf of all its citizens. The doctrine of sovereign immunity as applied to democratic government is also based upon the proposition that since a democratic state represents the people an action against it is in effect suing oneself, which is a legalistic anomaly.

The *doctrine of implied consent* has grown out of judicial interpretation of the *doctrine of sovereign immunity* weighed against other equally important tenets of the law.

The question is posed by the concurring opinion as to whether this court should determine the questions involved solely upon constitutional grounds; that is, whether the alleged loss to plaintiff corporation, based upon the contract involved, is "property" within the meaning of Article II, section 25 of the Constitution of Colorado, and whether "due process of law" has been afforded plaintiff.

■ The majority of this court adhering to the rule that decisions will not be based upon constitutional grounds unless necessary to a determination of the issues involved, prefer to decide the issues before us on the clean cut example of implied consent. To do otherwise would be to ignore the *ratione decidendi* of the case, flaunt *stare decisis* and engage in fathering more dicta. It is true that *Boxberger v. Highway Dept.*, and *Highway Dept. v. Dawson,* supra, cannot be reconciled with some of the other opinions of this court relating to sovereign immunity as stated in the concurring opinion. To reconcile those cases with other decisions and overrule those deemed erroneous and out of harmony with the *Boxberger* and *Dawson* cases, is not necessary or proper to a determination of the issues before us.

All that we are holding, and can hold here, is that as to the *contract* entered into between the parties to this action, the state has waived its immunity from suit.

■ The theory has been advanced that the legislature has provided exclusive administrative procedures by which *all claims* against the state must be presented to, and heard, allowed and determined by, the state controller. C.R.S. '53, 130-2-1, 2 and 4, are cited as authority for this position. We state that this is not such a case. Amounts contracted to be paid are not "claims" within the meaning of these statutes. Webster's New

International Dictionary, Second Edition, says in part in defining the word "claim": "Syn.—Claim, Assert, Maintain. It is error to use *claim* in the sense of *assert* or *maintain* when there is no question of the assertion or maintenance of one's right, title, advantage, or the like."

Let us examine the facts before us and the statutes in question. The record shows:

1. That paragraph 12 of the complaint recites, "That in July and August, 1954, plaintiff, by and through its president * * * duly filed a petition for (sic) the Commission of Agriculture requesting payment of sums due, and which payment has now finally been refused."

2. That the contract entered into contained the following express provisos as to payments:

(a) "TERMS AND CONDITIONS OF THE INVITATION FOR BIDS (which is unnumbered Section I) * * *

"6. SELLERS INVOICES. — Invoices shall be prepared and submitted in triplicate unless otherwise specified. Invoices shall contain * * *."

(b) "SECTION III. THE STATE AND ITS CO-OPERATORS AGREE: * * *

"3. To pay the contractor for the contract rate for such acreages as are acceptably sprayed."

(c) "SECTION IV. IT IS MUTUALLY AGREED AND UNDERSTOOD THAT: * * *

"18. Partial payments will be made on the basis of weekly reports and receipt of formal request for payment approved by the State and its cooperators as soon after the close of each week as properly certified vouchers can be *audited* and *passed for payment.* * * *." (Emphasis added.)

The allegedly applicable parts of the cited statutes read:

"130-2-1. Claims presented within two years.—Persons having claims against the state shall exhibit the same, with the evidence in support thereof, to the state controller to be audited, settled and allowed within two

years after such claim shall accrue, and not afterwards.

\* \* \*

"130-2-2. Suits—setoff—what may be shown.—In all suits brought in behalf of the state, no debt shall be allowed against the state as a setoff but such as have been exhibited to the controller and by him allowed or disallowed, except only \* \* \*."

"130-2-4. Certificate of indebtedness issued, when.— In all cases where the laws recognize a claim for money against the state, and no appropriations shall have been made by law to pay the same, the state controller shall audit and adjust the same, and when the claim shall have been approved by the governor and attorney general, he shall give the claimant a certificate of the amount thereof, under his official seal if demanded, and shall report the same to the general assembly, \* \* \*."

█ Reading the legislatively authorized contract with the cited statutes and the complaint we are forced to one of two conclusions, either of which affirms our position. First: the complaint affirmatively alleges filing of a petition (claim) requesting payment and that it was refused. The request naturally enough was filed with the other party to the legislatively authorized contract because it was that party who was authorized by the state to make the payments. Thus the contract itself was a waiver by the state of any statutory provisions urged upon us. Second: The method of payment provided by the contract does not mean that the invoices submitted thereunder were not actually submitted to the state controller for audit, settlement and allowance. In fact it may be standard operating procedure for this type of contract to have all invoices so approved and in such a case the Department of Agriculture would be the agent of the state to receive them for the auditor. There is no denial in this record that such was done and the plaintiff has affirmatively alleged the submission of its petition for payment to the same party who would have passed it on to the state controller, if that is the procedure

used, and as may have been done with the previous contract vouchers which were admittedly paid. To now hold in effect that the first vouchers paid under the contract were proper but that any balance due cannot be paid because not affirmatively shown by the record to have been filed direct with the state controller under C.R.S. '53, 130-2-1, would indeed be a travesty on fair dealing and justice.

■ We hold that these statutes do not require a person contracting with the state to file requests for payment with the state controller where money has been previously appropriated therefor and the contract itself provides for the method of payment.

The judgment is reversed and the cause remanded for further proceedings consistent with the views herein expressed.

MR. CHIEF JUSTICE MOORE and MR. JUSTICE HOLLAND specially concur. MR. JUSTICE FRANTZ and MR. JUSTICE HALL dissent.

MR. CHIEF JUSTICE MOORE specially concurring.

I believe that the questions raised by the record in this case, and the answers which should be given thereto, are as follows:

First: *Where a corporation enters into a contract with the State Department of Agriculture, under the terms of which such corporation obligates itself to supply materials and services in connection with an effort of the Department to eradicate a grasshopper infestation, and the legislature has appropriated funds for that purpose; and the Department, after entering into the contract and after part performance thereof, refuses to permit the materials and services to be supplied and fully performed as provided by the contract; does the loss alleged to have been sustained by the corporation amount to "property" within the meaning of Article II, section 25, of the Constitution of Colorado, which provides: "No*

*person shall be deprived of life, liberty or property, without due process of law"*?

I answer this question in the affirmative. When the Department and plaintiff entered into the contract alleged to have been made, rights of property were created which are entitled to all the protection afforded by the due process clause of the constitution. Even in a tort action this court has held that:

"A legal right to damage for an injury is property and one cannot be deprived of his property without due process. * * * " *Rosane v. Senger*, 112 Colo. 363, 149 P. (2d) 372.

If the above is a correct statement of the law as applied to an action ex delicto, it is certain that property rights grounded upon contract are within the protection of the constitutional provision which prevents the deprivation of "property" without due process of law.

Second: *Where a corporate plaintiff alleges that it entered into a contract with the Department of Agriculture to perform specific services, and because of a breach of said contract by the Department it suffered a loss of property; and where funds had been appropriated by the legislature for the purposes covered by the contract which plaintiff was ready, able and willing to perform; does the law require dismissal of the complaint upon the sole ground that the sovereign state is immune from suit and cannot be made defendant in an action, without its consent?*

In my judgment this question should be answered in the negative. To give an affirmative answer would mean that the due process clause of the constitution had been watered down or amended to read, "No person shall be deprived of life, liberty or property, without due process of law *by any person other than the sovereign State of Colorado.*" This I cannot sanction. Unjust and unreasonable exercise of sovereign power is the very thing which the constitutional provision was designed to prevent.

Our study of the opinions of this court dealing with

the subject of the state immunity from suit leads to the conclusion that the broad language used in some of the opinions cannot be reconciled with the constitutional provisions referred to. To illustrate these inconsistencies I direct attention to the following quotations: In *Parry v. Colorado Board of Corrections,* 93 Colo. 589, 28 P. (2d) 251, will be found these words:

"Without constitutional or legislative authority, the state in its sovereign capacity cannot be sued. No such authority exists in this state. This being so, no liability upon contract or tort, if any there be, can be enforced against the state in any of its courts."

Compare the above quotation with the following excerpts from the opinion in *Boxberger v. Highway Dept.,* 126 Colo. 438, 250 P. (2d) 1007:

"It seems needless to say that neither the executive nor the legislative branches of our government has any right whatsoever to deprive anyone of his life, liberty or property without due process or compensation, and surely it cannot be contended that under our system of government it was not intended that the judicial branch of the government stand open as a haven for the protection of any citizen whose rights have been invaded, whether it be by an individual or by either of the other branches of government. * * * The rights of a citizen remain the same whether they collide with an individual or the government, and judicial tribunals were wisely established to correct such matters without the individual being relegated to the position of no other remedy except to appeal to a legislature, maybe to no avail, * * *."

A study of the opinions of this court in the following cases will disclose the use of language which is in conflict and cannot be reconciled with the views expressed in this court's opinions in *Boxberger v. Highway Dept., supra,* and *Highway Dept. v. Dawson,* 126 Colo. 490, 253 P. (2d) 593; *In Re Constitutionality of Substitute for Senate Bill No. 83,* 21 Colo. 69, 39 Pac. 1088; *Mitchell v.*

*Board of County Commissioners,* 112 Colo. 582, 152 P. (2d) 601; *North Sterling District v. Dickman,* 59 Colo. 169, 149 Pac. 97; and *State of Colorado v. Colorado Co.,* 104 Colo. 436, 91 P. (2d) 481. The trial court, believing that the two cases first cited were distinguishable upon the material facts, and treating the broad statements contained therein as dicta, concluded that if a private citizen was to be permitted to maintain an action against the sovereign state without consent of the latter, such "judicial sanction * * * should issue from the Supreme Court and not an inferior tribunal."

Whatever may have been the rule heretofore, I am of the firm opinion that any citizen may resort to litigation to protect his life, liberty or property even though his adversary be the sovereign state of Colorado. The constitution cannot be so nullified as to permit the state to deprive a citizen of "property" without due process of law. The keystone in the structure of due process is that the person aggrieved shall have the unquestioned right to his day in court. The common law doctrine of sovereign immunity cannot prevail against the constitutional guarantee of a day in court for every claim based on an asserted property right. As stated by Mr. Justice Burke in *La Plata Co. v. Hinderlider,* 93 Colo. 128, 25 P. (2d) 187:

"Due process always implies a hearing or trial, and judgment. It secures the individual 'from the arbitrary exercise of the powers of government, unrestrained by the established principles of private rights and distributive justice.' *People v. Max,* 70 Colo. 100, 108, 198 Pac. 150. If private rights may be stripped from the citizen by state 'compacts,' by legislative fiat, by commissioners, by the uncontrolled discretion of state engineers, then 'due process' is dead in Colorado."

I adhere to the principles announced in *Boxberger v. Highway Dept., supra,* and *Highway Dept. v. Dawson, supra,* and consider them controlling in this action.

Third: *Apart from the due process clause of the Con-*

*stitution of Colorado, does the doctrine of state immunity from suit, as applied to the facts alleged in the instant case, offend against the provisions of Article II, section 3, and Article II, section 6, of the Constitution of Colorado?*

In my judgment this question requires an affirmative answer. The constitutional provision first mentioned in the foregoing question provides as follows:

"All persons have certain natural, essential and inalienable rights, among which may be reckoned the right of enjoying and defending their lives and liberties; *of acquiring, possessing and protecting property;* \* \* \*." (Emphasis supplied.)

If the right to acquire, possess, and *protect* property is "inalienable," the individual cannot be deprived of it without his consent, either by the legislature or by the outmoded common law doctrine of sovereign immunity. There is no adequate way to protect property if resort to the judicial process is withdrawn. The constitutional right to protect property is guaranteed to *all persons* and we should not by judicial pronouncement alter or qualify those words to mean "all persons except those doing business with the state."

Support for the foregoing conclusion is found in the provisions of Article II, section 6 of the Colorado Constitution, where we find the following:

"Courts of justice shall be open to *every person,* and a speedy remedy afforded for every injury to person, *property* or character; and right and justice should be administered without sale, denial or delay." (Emphasis supplied.)

I would point out that the fundamental law of this state guarantees *every person* an open door to the judicial process of the state in his quest for "right and justice." The constitution, in guaranteeing to every person access to the courts for redress and speedy remedy "for every injury to person, property or character," did not discriminate against those whose injury to property was

occasioned by acts of the State of Colorado. I am satisfied that the provisions of the constitution under discussion were intended to serve a definite purpose, and that where the plain meaning of the words employed are pertinent to a dispute this court should not hesitate to apply them to protect the individual citizen in the practical enjoyment of the inalienable rights guaranteed to him by that constitution.

I reach this conclusion notwithstanding former opinions of this court in which no reference is made to the said constitutional provisions. If constitutional government is to survive we must give practical effect to the fundamental law in resolving the problems of the individual citizen. A Bill of Rights which sets forth freedoms which are stated to be "inalienable" amounts to nothing if by fanciful judicial interpretation these rights are frittered away until nothing is left but an empty shell for display purposes on patriotic occasions. In several states where the doctrine of sovereign immunity from suit is firmly intrenched, there are constitutional provisions to the effect that the state cannot be subjected to legal action without its consent. There is no such provision in the Constitution of Colorado. The absence of such provision, when considered in connection with the language of Article II, section 3, and Article II, section 6, is most significant.

It is a historical fact, that when the constitution of the State of Colorado was adopted it was patterned largely upon the constitution of the State of Illinois. The constitution of that state then, and even now, contains a provision as follows:

"The state of Illinois shall never be made defendant in any court of law or equity."

That a similar provision was not incorporated in the Colorado Constitution, although present in the instrument which unquestionably was used as a model, is persuasive evidence that the doctrine of sovereign immunity was discarded by its framers. *Twilley v. Durkee,* 72

Colo. 444, 211 Pac. 668; *Adams v. Bolin,* 74 Ariz. 269, 247 P. (2d) 617.

"In the interpretation of a constitutional provision, deviation of the language thereof from the language of a provision of the constitution of another state, used by the constitutional convention as a model, indicates an intention to depart from the meaning of the provision of the other state." 11 Am. Jur. 685-6, Cum. Supp. page 95.

The guaranty of our constitution that a speedy remedy shall be afforded for every injury to property, is not met by the argument that the "remedy" available is to seek relief at the hands of the legislature. I make this assertion notwithstanding language indicating a contrary view to be found in *State of Colorado v. Colorado Postal Telegraph-Cable Co.,* 104 Colo. 436, 91 P. (2d) 481. In the opinion in that case it was stated that the "ascertainment of the state's constitutional liability and the making of provision to meet it is a proper function of the legislative department of government." It is evident that this broad language might appear to sanction or authorize legislative action out of harmony with Article V, section 28, of the Constitution of Colorado which limits the power of the legislature to appropriate money. That section provides, inter alia:

"No bill shall be passed * * * providing for the payment of any claim made against the state without previous authority of law."

Thus, if a citizen, having entered into a contract with the state, be denied the right to sue and thereby establish by "authority of law" the legality of his claim against the state, the legislature by the express terms of the above-quoted constitutional provision is prohibited from affording relief and the claimant would be compelled to go empty handed. If, however, the right to sue the state is recognized and upon trial the claim is found to be valid, the legislature could make a constitutional appropriation to pay the judgment because such an appropriation would not be one made "without previous

authority of law." The appropriation would necessarily follow the entry of judgment.

I concur in the reversal of the judgment for the foregoing reasons; I am unable to concur in the grounds for reversal as set forth in the opinion of Mr. Justice Sutton.

Mr. Justice Holland concurs in this opinion, under which a reversal of the judgment would result; he does not concur in the opinion of Mr. Justice Sutton under which a reversal of the judgment results on other grounds.

MR. JUSTICE FRANTZ dissenting:

I am in disagreement with the other opinions because I am satisfied the legislature has provided administrative remedies by which claims may be presented, heard and determined. Where primary jurisdiction is reposed in an administrative agency, the court is not the forum to which the claimant may resort for relief in original proceedings. 73 C.J.S., pg. 347, §40. Furthermore, the statutorily created administrative remedy must be exhausted before application may be made to the courts to assume jurisdiction. *Hannum v. Hillyard,* 131 Colo. 37, 278 P. (2d) 1015. Only where the tribunal exercises judicial functions may such review be had. *State Board v. Carpenter,* 16 Colo. App. 436, 66 Pac. 165; *Civil Service Comm. v. Cummings,* 83 Colo. 379, 265 Pac. 687. And in the absence of a plain, speedy and adequate remedy at law, review in the nature of certiorari lies. *Swift v. Smith,* 119 Colo. 126, 201 P. (2d) 609.

If these conditions are present, the court's sole function then becomes that of ascertaining whether the administrative authority "has exceeded its jurisdiction or abused its discretion." 106 (a) (4) R.C.P. Colo. Once an administrative body is vested with the power of conducting hearings and making determinations which are judicial in nature, its actions in such hearings are always reviewable upon proper and timely presentation in a

court on charges of acting in excess of jurisdiction or arbitrarily.

Application of the foregoing principles to the instant case leads to conclusions inconsonant with those reached in the other opinions. An orderly administrative procedure is outlined in the statutes. C.R.S. '53, 130-2-1, provides that: "Persons having claims against the state shall exhibit the same, with the evidence in support thereof, to the state controller to be audited, settled and allowed within two years after such claim shall accrue, and not afterwards." Provision is made for the set-off of claims against the state in suits instituted by the state. C.R.S. '53, 130-2-2. The next section sets up the machinery for hearings in these words: "The controller whenever he may think it necessary to the proper settlement of any account, may examine the parties, witnesses and others, on oath or affirmation, touching any matters material to be known in the settlement of such account, and for that purpose may issue subpoenas, and compel witnesses to attend before him and give evidence. Upon failure or refusal of any witness to obey any subpoena, the controller may petition the district court, and upon proper showing, the court may enter an order requiring the witness to appear and testify or produce documentary evidence. Failure to obey the order of court shall be punishable as a contempt of court." By C.R.S. '53, 130-2-4, it is provided: "In all cases where the laws recognize a claim for money against the state, and no appropriations shall have been made by law to pay the same, the state controller shall audit and adjust the same, and when the claim shall have been approved by the governor and attorney general, he shall give the claimant a certificate of the amount thereof, under his official seal if demanded, and shall report the same to the general assembly, with as little delay as possible, giving a statement in tabular form of the number, date of issue, and amount of each certificate and for what purpose issued. No indebtedness shall be incurred, or

certificate of indebtedness issued, for any purpose for which an appropriation has been made and exhausted, unless the necessity for the creating of such indebtedness, and the issuing of such certificate, is caused by a casualty happening after the making of the appropriation; and in all such cases the question of incurring such indebtedness shall be first submitted to the governor and attorney general, for their approval."

Since the controller "is called upon to audit and examine claims," in the doing of which he "is invested with judicial powers," *People v. Auditor,* 2 Colo. 97, his actions are the subject of review by courts. There being no specific provision for review, the general law, reposing in courts the power to review in order to ascertain whether the controller acted in excess of jurisdiction or arbitrarily, applies.

"Boards for the audit and adjustment of public indebtedness and claims against the states are very common instrumentalities in the administration of their finances." *Post Printing and Publishing Co. v. Shafroth,* 53 Colo. 129, 124 Pac. 176. And Colorado has frequently adopted such administrative procedure. "Similar powers and duties by executive officers and boards in the auditing and allowance of claims, and the funding of public indebtedness, both by constitutional provisions and legislative enactments, have repeatedly been adopted in this state. Without being understood as passing upon the constitutionality of any such legislative enactments, we call attention to a few of the many heretofore in force. The auditor of state is authorized *to audit and settle all claims against the state,* and to issue warrants in payment therefor, thereby deciding, who is entitled to a warrant, the amount of the indebtedness, etc.

"Sections 6204 and 6234, Revised Statutes, 1908. *Our statutes have always required that persons having claims against the state shall exhibit them with the evidence in support thereof to the auditor to be by him audited, settled and allowed.* Section 6232, supra.

"Also, that the auditor may examine the parties, witness and others on oath touching matters material to be known in the settlement of such accounts; he may issue subpoenas and compel witnesses to attend before him and give evidence in the same manner and by the same means allowed by law to courts of record. Section 6234, supra." (Emphasis supplied.) *Post Printing and Publishing Co. v. Shafroth,* supra.

Similar statutory provisions are to be found in most states of the Union. Under varying circumstances their purpose, scope and nature have been defined. So far as can be ascertained all claims based upon rights flowing from contracts must be lodged, and pursued to determination, before the designated agency. *Clark v. Carter,* 86 Okla. 126, 209 Pac. 932; *State v. Angle,* 56 Ariz. 46, 104 P. (2d) 172; *State v. Brandon,* 244 Ala. 62, 12 So. (2d) 319; *U'Ren v. State Board,* 31 Calif. App. 6, 159 Pac. 615.

In the last cited case language having a particular pertinency to our problem is to be found. I quote: "In the closing brief of appellant it is earnestly and elaborately contended that, since as a fundamental proposition the state cannot be sued without its consent, and since this action is in the nature of a suit to compel the payment of money to plaintiff by the state, that it cannot therefore be maintained. But to our minds this principle has no application to the instant case. This is not in form or substance an action against the state to determine a contested claim against its treasury. The state has already by the act of its Legislature set apart a specific fund for the payment of such obligations as the conservation commission had power to create; and the state has also by legislative act invested said conservation commission with the express power to create this specific obligation through its employment of the plaintiff to assist in carrying into effect the objects of its existence. The state is thus in a position of having assented to this claim; and this is an action or proceeding merely

to compel the official auditor in the form of the board of control to perform a duty expressly enjoined upon it by law."

As limited by the scope of review afforded by Rule 106 (a) (4), the state is amenable to court action, and not otherwise. This suit lacks most of the elements necessary to bring it within the rule.

It is my opinion that this case should be affirmed on the ground of failure to invoke and exhaust the administrative remedy created by the cited statutes.

MR. JUSTICE HALL concurs in this dissent.