**WHEAT RIDGE URBAN RENEWAL AUTHORITY, Petitioner**

v.

**The CORNERSTONE GROUP XXII, L.L.C., Respondent.**

No. 06SC591.

Supreme Court of Colorado, En Banc.

Dec. 3, 2007.

Hayes, Phillips Hoffmann & Carberry, P.C., Corey Y. Hoffmann, Denver, Colorado, Light Harrington & Dawes, P.C., Steven J. Dawes, Denver, Colorado, Attorneys for Petitioner.

Messner & Reeves, LLC, Thomas D. Leland, Tanya E. Milligan, Denver, Colorado, Attorneys for Respondent.

The Holt Group, LLC, Meredith A. Kapushion, Denver, Colorado, Pacific Legal Foundation, Timothy Sandefur, Sacramento, California, Attorneys for Amici Curiae Pacific Legal Foundation and Arthur Fast.

Justice COATS delivered the Opinion of the Court.

Wheat Ridge Urban Renewal Authority sought review of the court of appeals' judgment in *Cornerstone Group XXII, L.L.C. v. Wheat Ridge Urban Renewal Authority*, 151 P.3d 601 (Colo.App.2006). The district court preliminarily enjoined the Renewal Authority from dissipating assets needed to complete the redevelopment project that was the subject of its contract with the Cornerstone Group; but the court also found that it was incapable of ordering the Renewal Authority to condemn particular properties, regardless of any contractual obligations to do so, and it therefore dismissed Cornerstone's claim for specific performance. The court of appeals affirmed the preliminary injunction but reversed the district court's order of partial dismissal, finding that under the circumstances of this case it might be both permissible and appropriate to order the Renewal Authority to proceed with its petitions in condemnation.

We granted the Renewal Authority's petition challenging the latter holding. Because the district court rightly determined that it lacked the authority to order the specific performance of a contractual obligation to exercise the core governmental power of eminent domain, and the Renewal Authority could not be estopped from abandoning its petitions in condemnation, under the circumstances of this case, the judgment of the court of appeals is reversed. Because, however, the Renewal Authority's agreement to acquire specific properties, by condemnation if necessary, does not render the contract void, the case is remanded with directions to return it to the district court for consideration of Cornerstone's remaining claims, including its claims for breach of contract.

## I.

The Cornerstone Group filed a civil action against the Wheat Ridge Urban Renewal Authority and the City of Wheat Ridge, alleging breach of contract and claims of equitable and promissory estoppel. As relief, it sought indemnification from damage claims by Walgreens, a constructive trust, declaratory and injunctive relief, specific performance of the breached contracts, and damages for the breaches. Cornerstone also filed a motion for preliminary injunction, with regard to which the district court took evidence and made findings of fact and conclusions of law.

The district court found that the Renewal Authority and Cornerstone entered into a "Disposition and Development Agreement" to redevelop five parcels of property in Wheat Ridge. The DDA obligated the Renewal Authority to acquire these parcels at its own expense, by eminent domain if necessary, and sell them to Cornerstone, in order to build a Walgreens store. It further provided for enforcement of the agreement by specific performance, injunction, or any remedy available at law.

After the Renewal Authority failed to obtain the necessary financing, Cornerstone agreed to provide financing on terms memorialized in a separate "Loan Agreement" and "Line of Credit Note." The loan agreement obligated the Renewal Authority to initiate litigation in eminent domain for the immediate possession and acquisition of the parcels if negotiated agreements were not reached by a certain date, and it too provided for its own enforcement by specific performance.

When the Renewal Authority failed to acquire all five properties or begin condemnation proceedings by the loan agreement's deadline, Cornerstone sent notice that the Renewal Authority had defaulted its obligation under the loan agreement. Although the Renewal Authority later filed petitions in condemnation against the four properties it had thus far failed to acquire, the petitions did not salvage the deal. Cornerstone and the Renewal Authority exchanged a series of recriminating letters, and ultimately the Renewal Authority notified Cornerstone that it was terminating the DDA and rescinding its approval of the loan agreement. It subsequently negotiated settlements with two of the landowners to abandon already initiated condemnation proceedings, and it was in the process of negotiating similar settlements with the other two owners.

The district court largely granted the motion for preliminary injunction, ordering the Renewal Authority to retain all assets and funds necessary and incidental to the redevelopment project. With regard to Cornerstone's tenth claim for relief—its demand for specific performance of the contracts—the district court found that the subject properties could not be acquired unless the Renewal Authority exercised its power of eminent domain, but ruled that it lacked the authority to order the Renewal Authority to do so; and in response to Cornerstone's ensuing motion, the court entered final judgment pursuant to C.R.C.P. 54(b), dismissing that claim for relief in its entirety. Both parties appealed the district court's rulings, Cornerstone challenging the dismissal of its claim for specific performance and the Renewal Authority challenging the preliminary injunction.

The court of appeals affirmed the district court's preliminary injunction but reversed its judgment dismissing Cornerstone's tenth claim for relief. With one member of the panel dissenting, the court rejected the Renewal Authority's assertion that contractual agreements to exercise the uniquely governmental power of eminent domain are necessarily void, instead apparently considering their enforceability dependent upon the extent to which eminent domain proceedings had already progressed and the equities of the individual case. The court of appeals ultimately remanded for reconsideration of Cornerstone's claim for specific performance, ordering the district court to determine, under the circumstances of this case, whether the Renewal Authority should be estopped from abandoning its condemnation petitions and whether Cornerstone, in fact, has a vested right to specific performance of the Renewal Authority's promise to condemn.

The Renewal Authority petitioned this court for a writ of certiorari, solely to review the court of appeals' holding with regard to specific performance.

## II.

Specific performance is an equitable remedy for breach of contract. *Setchell v. Dellacroce*, 169 Colo. 212, 216, 454 P.2d 804, 806 (1969). As a theory of recovery, breach of contract is separate and distinct from both the quasi-contractual claim of promissory estoppel and the defensive doctrine of estoppel in pais, or equitable estoppel, all three of which were separately pled by Cornerstone. Only Cornerstone's request for specific performance was considered and rejected by the district court, and only the

court's ruling dismissing Cornerstone's tenth claim for relief was certified as a final judgment for purposes of immediate appeal.

It appears that the appellate court equated any theory requiring condemnation of the subject properties with specific performance of the contract or at least that the question of specific performance could not be fully resolved without consideration of Cornerstone's estoppel claim. It therefore immediately moved to the question whether the Renewal Authority could be estopped from abandoning its earlier-initiated condemnation proceedings. Determining that under certain circumstances it could, the appellate court, without ever directly addressing the district court's authority to order the specific performance of a contractual obligation to exercise the power of eminent domain, reversed the district court's order of dismissal and remanded for consideration of the relative equities involved in evaluating a claim of estoppel. In light of the appellate court's directions on remand, and its implication that Cornerstone's claim of specific performance could not be fully resolved without simultaneous resolution of its assertions of estoppel, the applicability of estoppel principles is necessarily before this court.

 Promissory estoppel is an offensive theory of recovery, or cause of action, providing a remedy for those who rely to their detriment, under certain circumstances, on promises, despite the absence of any mutual agreement by the parties on all the essential terms of a contract. *Vigoda v. Denver Urban Renewal Auth.*, 646 P.2d 900, 905 (Colo. 1982). Recovery on a theory of promissory estoppel is incompatible with the existence of an enforceable contract. *Scott Co. of Cal. v. MK–Ferguson Co.*, 832 P.2d 1000, 1003 (Colo. App.1992). By contrast, the doctrine of equitable estoppel is not a cause of action at all, but rather a defensive doctrine, which may be invoked "to bar a party from raising a defense or objection it otherwise would have, or from instituting an action which it is entitled to institute." *Jablon v. United States*, 657 F.2d 1064, 1068 (9th Cir.1981); *see also Piz v. Housing Auth. of the City & County of Denver*, 132 Colo. 457, 463, 289 P.2d 905, 908–909 (1955) ("The doctrine of equitable

estoppel has been invoked to cut off rights or privilege conferred by statute . . .").

In the course of distinguishing it from the quasi-contractual action of promissory estoppel, we have at times loosely referred to equitable estoppel as a tort action, but it is more precisely characterized as an equitable doctrine that suggests a tort-related theory in that it attempts to allocate loss resulting from the misrepresentation of facts to the most culpable party and to ameliorate an innocent party's losses. *Compare Bd. of County Comm'rs v. DeLozier*, 917 P.2d 714, 716 (Colo.1996) ("[A] claim for equitable estoppel lies in tort, whereas a claim of promissory estoppel lies in contract."), *with Berg v. State Bd. of Agric.*, 919 P.2d 254, 259 (Colo. 1996) ("Equitable estoppel, because it is based on the misrepresentation of facts, is fundamentally a tort theory."). But whatever its theoretical relation to tort law, equitable estoppel is not a cause of action.

In *Piz*, this court, in express reliance on the California case of *Times–Mirror Co. v. Superior Court*, 3 Cal.2d 309, 44 P.2d 547 (1935), applied the doctrine of estoppel in pais, or equitable estoppel, to bar a municipality from exercising its prerogative to abandon a condemnation proceeding before completion. *Piz*, 132 Colo. at 471–72, 289 P.2d at 912–13. Under the extraordinary circumstances of that case, in which the property owner constructed a new business in reliance upon actions and representations of the municipality/condemnor that made the complete loss of his existing business appear virtually inevitable, the municipality was held to be equitably estopped from invoking its privilege to terminate its own condemnation action and avoid compensating the owner for the lost value of his property. *Id.*

Although estoppel under those circumstances effectively forced the municipality to finalize its condemnation action, there was never any suggestion that the municipality could be forced to condemn private property as the result of a prior agreement. Precluding abandonment under those circumstances was merely one method of insuring payment for property the municipality had, by its own representations and conduct, already rendered valueless to its owner. Piz's assertion

of equitable estoppel was comparable to a claim for inverse condemnation, based on a *de facto* taking of his business, excepting only that it was asserted in the course of an ongoing condemnation proceeding, for the purpose of precluding a detrimental change of position by the municipality. *See, e.g., Krupp v. Breckenridge Sanitation Dist.,* 19 P.3d 687, 695 (Colo.2001) ("A taking unquestionably occurs when an entity clothed with the power of eminent domain substantially deprives a property owner of the use and enjoyment of that property."); *see also* 2A Julius L. Sackman, *Nichols on Eminent Domain* § 6.01[15][b] (3d ed. 2006) ("A *de facto* taking does *not* require a physical invasion or appropriation of property. Rather, a substantial deprivation of a property owner's use and enjoyment of his property may, in appropriate circumstances, be found to constitute a 'taking' of that property or of a compensable interest in the property.").

While we nowhere expressly limited the applicability of equitable estoppel in the context of condemnation proceedings to an owner whose property is subject to condemnation, that was the necessary implication of our holding in *Piz.* Only a party to a condemnation proceeding would be positioned to assert equitable estoppel as a defense to a maneuver by the condemnor to terminate the proceeding without compensating the condemnee for damage already done. *Piz* properly applied the doctrine of equitable estoppel to prevent the municipality from exercising its right to abandon condemnation proceedings and thereby avoid compensating Piz for property it had already effectively taken. To extend the doctrine to a third party seeking enforcement of a contract, as the court of appeals proposes, would transform its fundamental character from that of an equitable defense to one of an offensive cause of action.

The doctrine of equitable estoppel relied on by this court in *Piz* therefore cannot provide a basis for Cornerstone to force acquisition of private property by eminent domain. This is true regardless of the indefensibility of the Renewal Authority's conduct, the extent of the injuries actually suffered by

Cornerstone, or the willingness of the individual owners to have their property condemned. As a result, the court of appeals erred in reversing the dismissal of Cornerstone's claim for specific performance, even if the appellate court merely intended that any ruling on specific performance be made in conjunction with consideration of Cornerstone's claim of equitable estoppel.

## III.

▮ The Renewal Authority asserted, and the dissenting panelist of the court of appeals concurred, that a contractual condition to condemn particular property is necessarily void. If that were indeed the case, there would still be no need to directly consider the district court's authority to order specific performance as a remedy for breach of contract by a governmental entity. In the absence of a valid contract to be breached, a remedy for breach would simply not be at issue. The matter of the court's authority to order specific performance is not so easily avoided, however, because a contract is not rendered void merely by the fact that it includes a commitment to exercise a core governmental power.

▮ The Renewal Authority's assertion of voidness derives from what has come to be known as the doctrine of reserved powers. It has long been held that certain core governmental powers, like the power of eminent domain and the police power, are reserved to the sovereign and cannot be abdicated or surrendered by contract.[1] *See Contributors to Pa. Hosp. v. City of Phila.,* 245 U.S. 20, 23–24, 38 S.Ct. 35, 62 L.Ed. 124 (1917) (holding that the eminent domain power cannot be surrendered by contract); *Stone v. Mississippi,* 101 U.S. 814, 817, 25 L.Ed. 1079 (1879) ("All agree that the legislature cannot bargain away the police power of the State."). Any attempt to do so is simply unenforceable. *U.S. Trust Co. of N.Y. v. New Jersey,* 431 U.S. 1, 23, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977) ("In short, the Contract Clause does not require a State to adhere to a contract that surrenders an essential attribute of its sovereignty."); *see also Pub. Serv. Co. of*

1. The scope of the police power is not before the court in this case.

*Colo. v. City of Loveland,* 79 Colo. 216, 228, 245 P. 493, 499 (1926) (stating that city authorities lacked "any power to execute a disclaimer upon behalf of themselves or future city councils depriving them of the free exercise of their [eminent domain power]").

■ The notion of reserved sovereign powers first arose in the jurisprudence of the United States Supreme Court as an explanation of the limits of the Contract Clause. *United States v. Winstar Corp.,* 518 U.S. 839, 874, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) (stating that the reserved powers doctrine was developed to prevent public contracts from becoming a "threat to the sovereign responsibilities of state governments"). State action to condemn particular property for public purposes, despite the government's earlier commitment not to do so, was upheld against challenges that it impaired the obligation of contract, on the ground that the sovereign's surrender of its power of eminent domain could never be an enforceable obligation of contract in the first place. *See West River Bridge Co. v. Dix,* 47 U.S. 507, 533, 12 L.Ed. 535 (1848) (holding that the Contract Clause did not prevent the state from condemning a toll bridge built pursuant to an exclusive franchise granted by the state years earlier). In this way, the Supreme Court reasoned that the Contract Clause never demands a state's adherence to a contract that surrenders an essential attribute of its sovereignty. *U.S. Trust,* 431 U.S. at 23, 97 S.Ct. 1505. Whether or not it intended that governmental entities be relieved of all liability for injury suffered in reliance on such promises, the Supreme Court's Contract Clause rationale has led to the well-accepted proposition that contracts surrendering the power of eminent domain are void. *Id.*

■ The same, however, cannot be said of commercial agreements to acquire particular private properties, by condemnation if necessary, and sell them for redevelopment. The reserved powers doctrine rests on a fundamental inability of sovereign governments to contract away essential attributes of their sovereignty. *Georgia v. City of Chattanooga,* 264 U.S. 472, 480, 44 S.Ct. 369, 68 L.Ed. 796 (1924) (eminent domain "cannot be surrendered, and, if attempted to be contracted away, it may be resumed at will" because it "is so often necessary for the proper performance of governmental functions that the power is deemed to be essential to the life of the state"); *Pa. Hosp.,* 245 U.S. at 23, 38 S.Ct. 35 (legislative abdication of eminent domain is the "renunciation of power to legislate for the preservation of society or to secure the performance of essential governmental duties"); *West River,* 47 U.S. at 533 (eminent domain "remains with the States to the full extent in which it inheres in every sovereign government, to be exercised by them in that degree that shall by them be deemed commensurate with public necessity"). Despite limited authority to the contrary,[2] the doctrine of reserved powers implies nothing about the ability of governments to otherwise enter into contracts involving the exercise of their sovereign powers. *Cf. Winstar,* 518 U.S. at 888–89, 116 S.Ct. 2432 (finding the reserved powers doctrine inapplicable when "a contract ... does not strip the Government of its legislative sovereignty").

■ The power of eminent domain is the ability to take private property in the public interest, not the ability to refrain from such a taking. In common parlance, it seems highly questionable that a choice not to exercise a

**2.** *See Joleewu, Ltd. v. City of Austin,* 916 F.2d 250 (5th Cir.1990), *vacated in part on other grounds,* 934 F.2d 621 (5th Cir.1991); *Matsuda v. City & County of Honolulu,* 378 F.Supp.2d 1249 (D.Haw.2005); and *Hsiung v. City & County of Honolulu,* 378 F.Supp.2d 1258 (D.Haw.2005). The common thread running through *Joleewu* and the Hawaii cases is the assumption that there is no useful distinction between an agreement that prohibits the sovereign from acting and one that requires the sovereign to act. *See Joleewu,* 916 F.2d at 255 (reasoning that because the decision to acquire land for a public purpose is a governmental function, "so is the decision about the timing of the acquisition," and "[a] contract restricting a city's freedom in choosing when to acquire property is thus a contract in derogation of that function" and unenforceable under Texas law); *Matsuda,* 378 F.Supp.2d at 1257 ("A contract requiring the sovereign to exercise the power is just as limiting as a contract prohibiting it from doing so."); *Hsiung,* 378 F.Supp.2d at 1266 (same). Because we disagree with the assumption that the power to act is the same as the power not to act, we decline to follow the holdings.

particular power could meaningfully be characterized as the exercise of a different or opposite power. To the extent, however, that the term "power" could be used this way, it would nevertheless remain true that it is the power of eminent domain that has been classified as an essential attribute of sovereignty, not its opposite "power," which is clearly not particularly an attribute of sovereignty at all.

■ Beyond the Supreme Court's specific reference to "surrender" and "contracting away" the power of eminent domain, however, its concern that the Contract Clause not become a barrier to the future exercise of essential attributes of state government does not suggest similar treatment of contracts to acquire particular properties through the power of eminent domain. As long as government has not surrendered its power to take private property—as distinguished from its "power" not to take private property—it remains empowered to take, or retake as the case may be, that or other property in the future (for just compensation) and redistribute it in any manner that future circumstances and the public welfare demand.

It would in fact be counterproductive of the purposes of the Contract Clause to deny states the power to bind themselves to the exercise of their powers as a condition of commercially beneficial transactions. *See Robie v. Mass. Tpk. Auth.,* 347 Mass. 715, 199 N.E.2d 914, 922 (1964) ("There is no absolute rule of law invalidating a contract executed in contemplation of a taking and substantially as part of the same transaction. This result would be contrary to rational business judgment."). The power of states to enter into effective financial contracts cannot be questioned, *U.S. Trust,* 431 U.S. at 24, 97 S.Ct. 1505, and much like the future exercise of taxing and spending powers, to which a state clearly may bind itself, *id.,* a commitment to acquire particular properties, as one element of a broader commercial transaction, would seem to be precisely the kind of obligation the impairment of which the Contract

Clause was designed to prevent, as distinguished from one impermissibly impairing the government's power to act in the future.

## IV.

■ The Supreme Court has never suggested, however, that the Contract Clause subjects states to lawsuits for breach of contract, much less that it confers upon state courts the power to order specific performance against coordinate branches of government, or their delegees, for breach of contract. Quite the contrary, the Supreme Court has steadfastly recognized the principle of sovereign immunity from suit, including suit for breach of contract; and with regard to the federal government itself, it has limited relief for breach of contract to that expressly authorized by Congress. *See, e.g., Richardson v. Morris,* 409 U.S. 464, 465, 93 S.Ct. 629, 34 L.Ed.2d 647 (1973) (per curiam) (stating that Congress "authorize[d] only actions for money damages and not suits for equitable relief against the United States"); *United States v. Jones,* 131 U.S. 1, 18–19, 9 S.Ct. 669, 33 L.Ed. 90 (1889) (holding that Congress waived immunity only to suits seeking money damages and a suit seeking specific performance was therefore barred by sovereign immunity); *Hagood v. Southern,* 117 U.S. 52, 67–69, 6 S.Ct. 608, 29 L.Ed. 805 (1886) (holding that the Eleventh Amendment prohibits breach of contract suits against states in federal court). In support of its strict reading of Congress's waiver of immunity for breach of contract actions, the Supreme Court has emphasized the distinction between monetary compensation for wrongs done by government and equitable or specific relief, noting that courts cannot be permitted to exercise their compulsive powers to restrain the government from acting or to compel it to act. *Larson v. Domestic & Foreign Commerce Corp.,* 337 U.S. 682, 704, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949).

In contrast to the United States Supreme Court,[3] but like a minority of other states, a

---

**3.** The Court has rejected the theory that a state impliedly waives its immunity from suit when it enters a contract. *Fla. Dep't of Health & Rehab. Servs. v. Fla. Nursing Home Assoc.,* 450 U.S. 147, 149–50, 101 S.Ct. 1032, 67 L.Ed.2d 132 (1981) (per curiam) (holding that Florida did not impliedly waive its immunity to a suit alleging violations of Medicaid regulations when it agreed to

plurality of this court has held that "when a state enters into authorized contractual relations it thereby waives immunity from suit." *Ace Flying Serv. v. Colo. Dep't of Agric.*, 136 Colo. 19, 22, 314 P.2d 278, 280, (1957). The *Ace* plurality reasoned that the state lays aside its sovereignty when it enters a contract and binds itself "substantially as one of its citizens does when he enters into a contract." *Id.* at 23, 314 P.2d at 280. Whatever the merits of this rationale, neither *Ace* nor any subsequent reliance on it by this court involved a claim of specific performance for breach of contract, and the question of that equitable remedy has never been addressed by this court.[4]

Apart from any implied waiver of sovereign immunity, or consent to be sued in court, the question of equitable relief for breach of contract, or specific performance, implicates an additional concern for the separation of governmental powers. As recognized by the Supreme Court, there are "the strongest reasons of public policy" for the rule that specific performance cannot be had against the sovereign. *Larson*, 337 U.S. at 704, 69 S.Ct. 1457.

> The Government as representative of the community as a whole, cannot be stopped in its tracks by any plaintiff who presents a disputed question of property or contract right. As was early recognized, 'the interference of the Courts with the performance of the ordinary duties of the executive departments of the government would be productive of nothing but mischief.'

*Id.* (quoting *Decatur v. Paulding*, 39 U.S. 497, 516, 10 L.Ed. 559 (1838)); *see also Huntt v. Virgin Islands*, 382 F.2d 38, 44 (3d Cir.1967) ("We should think that a court of law and equity would hesitate to interfere in the performance by a legislative body of its political and policy decisions which, in the absence of evidence of taint or fraud, have as

their primary, if not sole, objective, the general well-being of the community they are selected to represent.").

While the Supreme Court has readily acknowledged that Congress has the power to entrust the business of the government to agencies that are able to contract and be sued in their own names, in the absence of such congressional action it nevertheless holds that courts are without the authority to order specific relief against the government for breach of contract. *Larson*, 337 U.S. at 704–705, 69 S.Ct. 1457. Whether this jurisdiction will similarly leave to the General Assembly the power to determine the availability of equitable relief for governmental breach of other kinds of contractual obligations is a question that need not be resolved in the case before us today. In light of the district court's finding that the instant contract could not be performed without the exercise of the Renewal Authority's power of eminent domain, it is enough that courts in this jurisdiction lack the authority to compel the exercise of core governmental powers that rest within the discretion of a coordinate branch of government, regardless of binding contractual obligations to do so.

It has long been recognized that the power of eminent domain lies within the exclusive province of the legislature, to exercise or delegate according to its discretion. *See Potashnik v. Pub. Serv. Co. of Colo.*, 126 Colo. 98, 101, 247 P.2d 137, 138 (1952) ("The power [of eminent domain] lies dormant in the state until the legislature speaks."); *see generally* 1 William Blackstone, *Commentaries* *109 (stating that "the legislature alone" may exercise the power of eminent domain). While a contractual obligation to condemn particular properties if necessary is not void, and while compensation may be ordered for injury resulting from its breach by the government, as a matter of public policy, if not

---

abide by those regulations as part of the contracts it entered with members of the Florida Nursing Home Association).

**4.** We have in the past found that under certain circumstances principles of equitable estoppel may prevent the government from denying the existence of a valid express contract. *Perl–Mack Enters. Co. v. City & County of Denver*, 194 Colo. 4, 8, 568 P.2d 468, 471 (1977); *City of Colo.*

*Springs v. Colo. City*, 42 Colo. 75, 88–89, 94 P. 316, 320 (1908); *see also Normandy Estates Metro. Recreation Dist. v. Normandy Estates Ltd.*, 191 Colo. 292, 296, 553 P.2d 386, 389 (1976) (a government entity may be prohibited from keeping particular property without paying the contract price because the contract was technically unenforceable).

constitutional necessity, the discretion to exercise the power of eminent domain in the public interest must remain with the body to which it was delegated, and not the courts.[5] *Huntt,* 382 F.2d at 44 ("In our view, only the most compelling reasons and the clear necessity to avoid the most unconscionable results could, if at all, sustain the substitution by the court of its judgment for that which is committed to the discretion of the legislative organ."). The district court therefore did not err in finding specific performance to be unavailable as a remedy for the breaches of the contract alleged by Cornerstone or in dismissing its tenth claim for relief.

## V.

Because the district court lacked the authority to order the specific performance of a contractual obligation to exercise the core governmental power of eminent domain and the Renewal Authority was not estopped from abandoning its condemnation petitions, the judgment of the court of appeals is reversed. Because, however, the Renewal Authority's agreement to acquire specific properties, by condemnation if necessary, does not render the contract void, the case is remanded with directions to return it to the district court for consideration of Cornerstone's remaining claims, including its claims for breach of contract.

Justice EID, concurring in part and concurring in the judgment only in part.

Justice EID, concurring in part and concurring in the judgment only in part.

I join in all but Part III of the majority's opinion, which addresses, and rejects, the Renewal Authority's argument that an agreement to condemn particular property is void. Maj. op. at 742–44. Even assuming, *arguendo,* that such an agreement is valid, the trial court has no authority to order specific performance as a remedy to compel the sovereign to exercise its eminent domain power under the agreement. *Id.* at 746. Thus, it is not necessary to decide the issue of the validity of the agreement—an issue with important constitutional implications—to arrive at the result we reach today. I therefore would not decide the issue. *See Town of Orchard City v. Bd. of Delta County Comm'rs,* 751 P.2d 1003, 1006 (Colo.1988) (stating that where "a constitutional question is not essential to the resolution of the issue before us, we will not address it"). Instead, I would assume, without deciding, that the agreement is valid, and hold that specific performance is not available as a remedy. This approach is consistent with the procedural posture of the case, in which the trial court certified its ruling that Cornerstone could not obtain specific performance as a final judgment under C.R.C.P. 54(b) in order to permit an interlocutory appeal on that issue. For these reasons, I join in all but Part III of the opinion.

---

**5.** In the respect that Cornerstone seeks a court order compelling the Renewal Authority to act, the case has much in common with a mandamus proceeding. *Cf.* C.R.C.P. 106(a)(2). We have consistently stated that "mandamus ordinarily does not lie to control the discretion of a public official." *Hawkins v. Cline,* 161 Colo. 141, 147,

420 P.2d 400, 403 (1966). What is true in mandamus proceedings is also true in a contract dispute when granting specific performance is tantamount to mandamus.