DAVID K. WIECKING, M.D., ETC., ET AL.

V.

ALLIED MEDICAL SUPPLY CORPORATION

Record No. 890533

April 20, 1990

Present: All the Justices

*Carol S. Nancy, Assistant Attorney General (Mary Sue Terry, Attorney General; John A. Rupp, Senior Assistant Attorney General,* on briefs), for appellants.

*Malcolm P. McConnell, III (Thomas F. Coates, III; Coates and Davenport,* on brief), for appellee.

JUSTICE RUSSELL delivered the opinion of the Court.

This appeal presents the questions whether a contractor's claim to compensation for services rendered at the request of an officer of the Commonwealth is barred by the defense of sovereign immunity, and if not, whether the officer had authority to enter into a contract on the Commonwealth's behalf.

The convoluted procedural history of the case is immaterial to the dispositive issues on appeal. The facts will be stated in the light most favorable to the contractor, who prevailed below.

The medical examiner of the county or city in which a death occurs from any of several causes, enumerated in Code § 32.1-283(A), is required by subsection (B) of that statute to "take charge of the dead body," investigate the cause and manner of death, and make a prompt report to the Chief Medical Examiner. The Chief Medical Examiner is required to furnish "facilities and personnel" to the local medical examiner for such an investigation, *id.*, but no express statutory provision is made for the payment of any expenses the medical examiner might incur.

Geoffrey T. Mann, M.D., LL.B., was the first Chief Medical Examiner in Virginia, serving from 1947 until his retirement in 1972. In 1962, he published a "Medical Examiner's Handbook" which set forth instructions, policies, and procedures pertaining to the operations of his office. This publication provided a schedule of fees to be paid by the Commonwealth to funeral directors for the transportation of human remains to a morgue for autopsy under a medical examiner's direction. In 1979, after Dr. Mann's retirement, his successor, David K. Wiecking, M.D., LL.B., amended the handbook to increase the schedule of approved fees.

Allied Medical Supply Corporation, formerly Allied Ambulance Service, Inc., (Allied), operates an ambulance service in the Richmond area. In 1970 or 1971, Dr. Mann met with Mr. E.C. Long, Allied's president, and reached an oral agreement that Allied would transfer dead bodies to the morgue in Richmond, when called upon by the medical examiner's office to do so, for the same fees as those set forth in the handbook pertaining to funeral directors. Thereafter, Allied transported dead bodies in the Richmond area to the morgue when called upon by the medical examiner's office, billed the local medical examiner for the service, and received payment in full from the Commonwealth for each such service. This arrangement continued without incident for approximately nine years.

In May 1979, the Commonwealth suspended payment of Allied's bills, although Allied continued to receive calls from the medical examiner's office to transport dead bodies from the point of death to the morgue, and continued to furnish the service in response to each call. When the Commonwealth's arrears reached $6,400, Allied made a claim for that amount, and, in 1980, filed this action in the Circuit Court of the City of Richmond against Dr. Wiecking, Chief Medical Examiner, Dr. James B. Kenley, State Health Commissioner, and Vincent J. Pross, Acting Comptroller (collectively, the Commonwealth).[1] After languishing on the court's docket for many years, the case came to a bench trial in 1987, resulting in a judgment for the plaintiff.

I

On appeal, the Commonwealth argues that the plaintiff's claim is barred by the doctrine of sovereign immunity and that the Commonwealth "did not consent to be sued." This argument requires a discussion of the questions whether the obligation the plaintiff seeks to enforce is a valid one and if so, whether this action lies for its enforcement.

The doctrine of sovereign immunity is "alive and well" in Virginia, as a defense to actions in tort, *Messina* v. *Burden*, 228 Va. 301, 307, 321 S.E.2d 657, 660 (1984), but we have never extended that defense to actions based upon valid contracts entered into by duly authorized agents of the government. For a number of compelling reasons, many jurisdictions considering that scenario have refused to accord immunity to the sovereign. Those reasons were ably summarized by Chief Justice Sharp, writing for the Supreme Court of North Carolina, in *Smith* v. *State*, 289 N.C. 303, 222 S.E.2d 412 (1976), *e.g.*: when the state contracts for goods or services, receives the benefit of the contract, and then refuses to honor its obligations, the contractor's property is subjected to an unconstitutional taking without just compensation, *Grant Const. Co.* v. *Burns*, 92 Idaho 408, 413, 443 P.2d 1005, 1010 (1968); a denial of liability under such circumstances also violates state and federal due-process guarantees, *George & Lynch, Inc.* v. *State*, 57 Del. 158, 162, 197 A.2d 734, 736 (1964);

---

[1] Dr. C.M.G. Buttery, Dr. Kenley's successor in office, and Edward J. Mazur, Comptroller, Mr. Pross's successor in office, have since been substituted as defendants in the places of their predecessors.

to hold that the state may enter into a valid contract and yet retain the power to avoid its obligation would entail an obvious contradiction; neither the state nor the contractor can be bound, yet not bound, by a single contract, *Kinsey Const. Co., Inc. v. S.C. Dept. of Mental Health*, 272 S.C. 168, 172, 249 S.E.2d 900, 903 (1978); the courts will not attribute to the legislature any intention to permit the government to exercise "bad faith and shoddy dealing," *Kersten Co. v. Dept. of Social Services*, 207 N.W.2d 117, 119-20 (Iowa 1973); and relegating the injured party to an appeal for justice to the legislature in the form of a private bill for relief is to offer a "doubtful remedy," *Ace Flying Service v. Colorado Dept. of Agriculture*, 136 Colo. 19, 22, 314 P.2d 278, 280 (1957). Indeed, the enactment of tort-claims legislation leaves unimpaired the existing remedies against the government for breaches of contract, even for contracts implied in fact which contain elements of a tort. *Hatzlachh Supply Co. v. United States*, 444 U.S. 460, 466 (1980).

■ The reasoning of the foregoing cases is virtually undisputed among the authorities which have considered the immunity question, and we find it persuasive. It is true that the legislature has the power to withhold appropriations to cover the state's obligations, *see P,T&L Const. Co. v. Commissioner, Dept. of Transp.*, 55 N.J. 341, 262 A.2d 195 (1970); *Smith v. State*, 289 N.C. at 311, 222 S.E.2d at 418; and impose special procedures for the processing of claims, *e.g.*, Code § 2.1-223.1 et seq.; their enforcement, *e.g.*, Code § 8.01-192; and time limitations upon their enforceability, *e.g.*, Code § 8.01-255. Those safeguards, however, affect only the remedy, not the validity of the obligation on which the claim is based. *See People ex rel. Dept. of Pks. & Rec. v. West-A-Rama, Inc.*, 35 Cal. App. 3d 786, 111 Cal. Rptr. 197 (1973).[2]

■ With respect to the remedy, we have construed Code § 8.01-192 and its statutory predecessors as the Commonwealth's general consent to be subjected to suit in its own courts in contract cases. *Stuart, Gov. v. Smith-Courtney Co.*, 123 Va. 231, 234, 96 S.E. 241, 242 (1918); *Parsons v. The Commonwealth*, 80 Va. 163, 167 (1885). In *Higginbotham's ex'x v. The Common-*

---

[2] The Commonwealth contends that the court erred in granting relief to the plaintiff because of the plaintiff's failure to comply with statutory procedural prerequisites. The record shows, however, that no error was preserved in that regard. Accordingly, we do not reach that contention. Rule 5:25.

*wealth*, 66 Va. (25 Gratt.) 627, 637 (1874), Judge Bouldin, writing for the Court, observed that it has been, since 1778, the "cherished policy of Virginia" to allow to citizens "the largest liberty of suit against herself" in contract cases.

Accordingly, we hold that the doctrine of sovereign immunity has no application in actions based upon valid contracts entered into by duly authorized agents of the government. The sovereign is as liable for its contractual debts as any citizen would be, and that liability may be enforced by suit in the "appropriate circuit court," Code § 8.01-192, if proper and timely proceedings are taken.

## II

We turn to the question whether the public officers who contracted for the plaintiff's services in the present case had authority to obligate the Commonwealth. The Commonwealth contends that Dr. Mann had no authority to enter into a continuing contract on its behalf and that his subordinate medical examiners similarly lacked authority to incur obligations against the public fisc. The Commonwealth argues that only the State Health Commissioner has direct statutory authority to enter into contractual obligations of this kind on its behalf, and that the Chief Medical Examiner, who is subordinate to the Commissioner, lacks authority to do so unless a delegation of power is shown. Asserting that no delegation of authority from the Commissioner to the Chief Medical Examiner was ever shown, the Commonwealth argues that Dr. Mann's agreement with Allied was *ultra vires*.

The Commonwealth relies on *County of York* v. *King's Villa*, 226 Va. 447, 452, 309 S.E.2d 332, 335 (1983), where we said that an *ultra vires* contract executed by an agent of the government is void *ab initio*, and will not be resurrected by the doctrine of estoppel. Further, we said that "those who deal with public officials must, at their peril, take cognizance of their power and its limits." *Id.* at 450, 309 S.E.2d at 334 (citations omitted).

The Commonwealth's contention is based upon an interpretation of the evidence in the light most favorable to itself. Because both Dr. Mann and Dr. M.I. Shanholtz, the State Health Commissioner under whom Dr. Mann had served in 1970, were advanced in years at the time of trial, counsel agreed to the unusual procedure of interviewing them by telephone and representing to the court what their testimony would have been. The court ac-

cepted this method and, without objection, heard the representations of plaintiff's counsel as to Dr. Mann's recollection and the representations of an assistant attorney general as to Dr. Shanholtz's recollection.

Thus related, Dr. Mann said that it was always his policy to insure that third parties who rendered services to his office, including transportation services, were compensated, because those services were essential to the performance of his duties. Further, he said that the schedule of fees in the handbook pertaining to the transportation of bodies was not limited in its application to funeral directors, but also applied to others who were called upon to transport dead bodies within the state. He said that whenever such transportation was necessary in connection with the functioning of the medical examiner's offices, those providing the transportation were entitled to payment within the published guidelines. He said that because the statute creating his position was unspecific "on how he, as the medical examiner, was to get his job done," he was required to enter into "*ad hoc* arrangements" around the state to provide for the transportation of bodies in the "most efficient way it could be done."

Dr. Mann had no direct recollection of his conference with Mr. Long in 1970, but he was "sure it probably happened." He said that his authority to order payment for services necessary to the functioning of his office had never, to his knowledge, been questioned.

The related statements of Dr. Shanholtz were that he had not given Dr. Mann blanket authority to "contract for an indefinite period of time for the State in a binding fashion." He did, however, say that after 1971, bodies were sometimes transported in Richmond by a state-owned vehicle, but occasionally "they [the medical examiners] would use whatever ambulance the City had contracted with." The evidence showed that Allied was the company with which the City of Richmond had a contract for ambulance services. Dr. Shanholtz stated that funeral directors were also required to arrange for the transportation of bodies. When transportation expenses were not covered by the family, he said, "the State would pick up the tab." Dr. Shanholtz did not indicate that the State Health Commissioner made any of these arrangements. Consequently, his statements were consistent with Dr. Mann's view that these services were essential to the functioning

of the Chief Medical Examiner, and were contracted by the latter with express authority.

Finally, the Commonwealth called as a witness Marcella F. Fierro, M.D., who has been the Commonwealth's Deputy Chief Medical Examiner for the Central District, which includes Richmond, since 1975. She testified that when a medical examiner was required to examine a body, arrangements would be made for its transportation. This would be accomplished either with a government-owned vehicle or "we will make an arrangement with somebody else. We may engage a funeral home, ambulance service, or we may engage a body transport service, but when we do that, we call them to authorize them and ask them to move the body for us from a place to the medical examiner's office, and we pay that bill."

■ That testimony is entirely inconsistent with the Commonwealth's position that no services of this kind could be contracted for except by the State Health Commissioner.

■ The Commonwealth concedes that the Commissioner had authority to make an express delegation, to the Chief Medical Examiner, of the power to contract for services essential to the operation of his office. The evidence was sufficient to support the conclusion, implicit in the trial court's ruling, that Dr. Mann exercised the powers necessarily incidental to the performance of his duties with the requisite authority. His contract with Allied, therefore, was not *ultra vires*.

Finally, the Commonwealth contends that even if Dr. Mann entered into a valid contract with Allied, the contract was terminable at will, and was in fact terminated in May 1979, when Mr. Long asked Dr. Fierro about the overdue account and was informed that no further payments would be authorized. In rendering services after that time, the Commonwealth contends, Allied was acting merely as a volunteer.

That argument is also premised upon an interpretation of the evidence in the light most favorable to the Commonwealth. Mr. Long testified that he went to see Dr. Fierro about the overdue account, that she expressed dissatisfaction with the way the matter had been handled by a clerk in her office, who was then on vacation, and that he left with the impression that the overdue bills would be paid as soon as the clerk returned to the office. He denied that Dr. Fierro or anyone else, at that time, told him that his contract was invalid or that no further payments would be au-

thorized, and for that reason he continued to render transportation services when requested. A year later, when no payments were forthcoming, he realized that Dr. Fierro had decided to deny payment in 1979.

Because the defense of sovereign immunity is inapplicable, and because the evidence, viewed in the light most favorable to the prevailing party, supports the trial court's conclusion, the judgment will be

*Affirmed.*