## CIRCUIT COURT OF ROCKINGHAM COUNTY

Faculty for Responsible Change

v.

Visitors of James Madison University

October 5, 1995

Case No. (Chancery) 15351

BY JUDGE JOHN E. WETZEL, JR.

This case came before the Court on the Defendant's motion for summary judgment on the grounds that this suit is barred by sovereign immunity, and that, if not so barred, the provisions of the faculty handbook relied upon by the Plaintiffs are not enforceable contract provisions; and on the Plaintiff's motion for partial summary judgment on the ground that there was a contract between the parties and that the Defendant breached that contract by its improper promulgation of certain curriculum changes. Roger S. Martin, Esquire, and David Z. Izakowitz, Esquire, appeared for the plaintiff; and C. Tabor Cronk, Esquire, Assistant Attorney General, appeared for the defendant.

The parties have briefed their respective positions well, and there is no need for further oral argument. Upon consideration of the argument of counsel and their memoranda of authorities, the Court has made the following decision to deny the Plaintiff's motion for partial summary judgment and to grant the Defendant's motion for summary judgment.

### I. *Statement of Material Facts*

The following material facts are not in dispute.

Complainant is a Virginia unincorporated association entitled "Faculty for Responsible Change" ("FRC"). FRC is composed of members of the faculty of James Madison University ("JMU"), a Virginia state institution of higher education.

Respondent is a Virginia public corporation entitled "The Visitors of James Madison University" (the "Corporation") which operates JMU.

Each member of FRC has assigned to FRC his or her cause of action presented in this bill of complaint. Each member of FRC is, and has been at all times relevant to the allegations of this bill of complaint, a party to a contract of employment with the Corporation.

Each such employment contract (collectively, the "Contracts") has included at all times relevant to the allegations of this bill of complaint, among its terms the provisions of the "James Madison Faculty Handbook" (the "Handbook") adopted and signed by the Corporation as a supplement to the Contracts.

The Governance Procedures of the Handbook provide that the JMU faculty has the "primary role" in connection with the development, modification and review of the curriculum, and that the president of JMU has the "final authority and responsibility" for curriculum matters.

The Handbook, which contains the Governance Procedures, provides in pertinent part that:

> Handbook (at 5), Section 2, Office Of The President
> President of the University
>
> The JMU Board of Visitors and the laws of the Commonwealth of Virginia invest the president of the university with full administrative responsibility for the institution . . . .
>
> In the implementation of the overall administrative responsibility for the university, the president relies upon the advice and assistance of faculty, students and administrative personnel. This is accomplished primarily through appointed faculty representatives, student representatives and administrative persons.
>
> Handbook (at 37), Section 12, University Governance
> (Untitled preamble)
>
> The president of the university has established procedures to receive advice and recommendations from the various constituencies on campus. This process allows for the presentation of ideas and recommendations by faculty, students or administrative personnel through committees, commissions or the University Council . . . .
>
> Curriculum Matters
>
> The faculty has the primary role in connection with the development, modification and review of the curriculum. *The final*

*authority and responsibility for curriculum matters is vested in the president.* [Emphasis added.]

Undergraduate curriculum matters are dealt with in each college by the Curriculum and Instruction Committee of that college. The Undergraduate Curriculum Council, composed primarily of faculty members, is the university body that has authority to make recommendations to the president on various undergraduate curriculum issues.

Graduate curriculum matters are dealt with by the Graduate Council. The Graduate Council reports through the dean of the graduate school to the vice president for academic affairs and the president.

The Governance Procedures provide that the University Council, the Undergraduate Curriculum Council, the Graduate Council and the Faculty Senate of JMU are recognized standing bodies from which the president is to receive the faculty's recommendations on curriculum, academic, and other university policy matters.

The Governance Procedures provide that meetings of all governance bodies, which include special committees and ad hoc committees, "will be open to any person belonging to the university community except for executive meetings held in accordance with *Robert's Rules of Order* and Virginia law."

On January 13, 1995, the Corporation announced that JMU would no longer have a College of Letters and Sciences, that college being merged into another, and that the position of Dean of the College of Letters and Sciences would be eliminated.

On January 13, 1995, the Corporation also announced it was eliminating all ten of the faculty positions in the JMU Physics Department, the physics major, and various physics courses as of August, 1996.

The decisions announced on January 13, 1995, were based on recommendations of a group of JMU administrators. FRC claims that this group was a special or ad hoc committee, and JMU characterizes this group as, "the most senior administrative and academic officers of the University [who] met on the matter as required in the performance of their respective, defined duties." The status of this group is not material to resolving the issues before the Court.

FRC contends that the special or ad hoc committee was composed of four administrators of the Corporation, one member of the president's staff, and possibly one other administrator of the Corporation.

In reaching the decisions announced on January 13, 1995, the Corporation acted without obtaining the recommendations of the University Council, the Undergraduate Curriculum Council, the Graduate Council, or the Faculty Senate.

FRC alleges that meetings of all University "governance bodies," including special and ad hoc committees, will be open to the "university community" with the exception of meetings closed in accordance "with *Robert's Rules of Order* and Virginia law." Bill of Compl. ¶ 12.

FRC also alleges that the University breached faculty employment contracts by deciding to merge one University college with another, and eliminate all faculty positions in the Physics Department, the physics major, and various physics courses by August 1996 (the "Decisions"), without first obtaining the recommendations of certain faculty bodies.[1] The Bill alleges the University acted on the recommendation of a special or ad hoc committee composed of administrators, whose meetings were not open to members of the University community. Bill of Compl. ¶¶ 13-23.

In its response to Request 5 of the University's First Request for Admissions (attached to the University's Mot. for Summ. J.), FRC admits that the decisions did not affect the employment, the courses taught, or the departmental assignment of any FRC member, but states such action "may" occur in the future. FRC also admits that the decisions do not yet affect participation of its members in delivery of classroom instruction, or to determine academic content and requirements of classes. FRC notes that the decision to merge several colleges means that curriculum decisions affecting departments "will now be made by College Curriculum and Instruction Committees whose priorities and character are likely to be significantly different from the committee which formerly existed for . . . [one of the two merged colleges]."

---

[1] The Association claims that the Decisions were made "in connection with the development, modification and review of the curriculum" under Handbook Section 12. Accordingly, the Association also claims that the University was prohibited from making the Decisions without first obtaining recommendations pursuant to Section 12. The University challenges the latter claim on motion for summary judgment. However, the University's position on the former is that the actions comprising the Decisions are not in fact matters of "development, modification and review of the curriculum," or motivated, or made, by the University as a result of any such activity. Rather, the sum of the Decisions is a program discontinuance, as recognized by the Handbook.

FRC does not allege that its claim is formally supported by the JMU faculty as a political body. FRC claims that by its actions JMU breached the binding provisions of the Governance Procedures.

JMU admits that the faculty at large had no prior notice of the action announced by the University on January 13, 1995. JMU Response Memo. (9/30/95), p. 3. JMU contends that notice to the faculty at large, even if required in *advance* of a "curriculum" action, as defined by Section 12, was not required in connection with the decisions announced on January 13. JMU claims that the announced decisions were not Section 12 "curriculum" actions, but, rather, were Handbook Section 8 program retrenchment or discontinuance decisions made for economic reasons.

## II. *Conclusions of Law*

### 1. *Standing*

The first question to consider is whether the Plaintiff has standing to maintain the asserted action. To determine standing the question is "whether . . . [the plaintiff] . . . has a sufficient interest in the subject matter of the case so that the parties will be actual adversaries and the issues will be fully and faithfully developed." *Cupp v. Board of Supervisors of Fairfax County*, 227 Va. 580, 589 (1984). As parties to contracts with the Corporation and as concerned members of the JMU community, FRC's members potentially have a legally cognizable interest in this controversy. That interest is demonstrated by the fact that the members have formed FRC and are supporting this litigation.

Section 8.01-26, Code of Virginia, specifically provides for assignment of an "action ex contractu." Section 8.01-13 allows an assigned cause of action to be brought in the assignee's name. *Lataif v. Commercial Industrial Const. Co.*, 223 Va. 59, 62 (1982). Section 8.01-26 was substantially amended and reenacted after the holdings of *Epperson v. Epperson*, 108 Va. 471, 62 S.E. 244 (1908), and *McGuire v. Brown*, 114 Va. 235, 76 S.E. 295 (1912), which the Defendant relies upon for the proposition that the rights asserted by the Plaintiff derive from personal service contracts, and, therefore, may not be assigned. *See* 63 Va. L. Rev. 1459 (1977). Neither the *Epperson* nor *McGuire* courts make any reference to an assignment statute. The present assignment statute is clear and unambiguous. "If a statute is clear and unambiguous, a court will give the statute its plain meaning." *Loudoun County Dept. of Soc. Services v. Etzold*, 245 Va. 80, 425 S.E.2d 800 (1993). "For this Court to place any limitation on the clear and comprehensive language of the statute, or to create an exception

where none exists under the guise of statutory construction, would be to defeat the purpose of the enactment and to engage in judicial legislation." *Town of Crewe v. Marler*, 228 Va. 109, 114, 319 S.E.2d 748 (1984). The present statute applies to all contract actions, so the Plaintiff has standing to assert contract rights of action, which were allegedly assigned to it. *See also Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 343 (1977) (under certain circumstances an association has standing to assert a cause of action for its members even without any assignment).

### 2. *Summary Judgment*

Summary Judgment is appropriate if there is no material fact genuinely in dispute. Supreme Court Rule 3:18; *Carson v. LeBlanc*, 245 Va. 135, 139, 427 S.E.2d 189 (1993). In *Metro Machine Corp. v. Mizenko*, 244 Va. 78, 83, 419 S.E.2d 632 (1992) citing *Gaudet v. Exxon Corp.*, 562 F.2d 351, 355 (5th Cir. 1977), *cert. denied* 436 U.S. 913 (1978), the Supreme Court analyzed the character of the genuine issue of fact criterion governing the Court's disposition of a motion for summary judgment and stated:

> [T]he issue of fact must be "genuine." When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . In the language of the Rule, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial."

While the Supreme Court of Virginia frowns on the short-circuiting of litigation where there are genuine issues of fact in dispute or conflicting inferences which may be drawn from uncontested facts, *see Renner v. Stafford*, 245 Va. 351, 429 S.E.2d 351 (1993), and *CaterCorp, Inc. v. Catering Concepts, Inc.*, 246 Va. 22, 431 S.E.2d 277 (1993) (ruling on demurrer), there is no genuine issue of fact in dispute or conflicting inferences upon which reasonable men could differ in this case, so it is ripe for resolution by summary judgment, as is evidenced by the cross motions for summary judgment.

### 3. *State Agency*

James Madison University and its Board of Visitors are agencies of the Commonwealth of Virginia which may potentially assert the defense of sovereign immunity. The Plaintiff has understandably conceded this point,

because there can be no question about it. JMU was created by the General Assembly, and all of its property belongs to the Commonwealth. Va. Code § 23-164.2. The University is governed by a board of visitors appointed by the Governor, and subject to confirmation by the General Assembly. Va. Code § 23-164.3. The University is also directly dependent upon general fund appropriations from the General Assembly. *See* Ch. 853, 1995 Va. Acts (approved May 5, 1995). With the exception of its private endowment funds and gifts, University funds from all sources are payable into the state treasury. Va. Code § 2.1-180. The University is part and parcel of the Commonwealth's higher education system, subject to the state controls and oversight established by the General Assembly in Title 23 of the Code of Virginia. Va. Code §§ 23-1.01, *et seq. See also Gargiulo v. Ohar*, 239 Va. 209, 387 S.E.2d 787 (1990) (Virginia Commonwealth University); *Messina v. Burden*, 228 Va. 301, 321 S.E.2d 657 (1984) (Frederick Campus of Tidewater Community College); *James v. Jane*, 221 Va. 43, 282 S.E.2d 864 (1980) (the University of Virginia); *Braken v. Merrill*, 27 Va. Cir. 208 (Shenandoah 1992) (V.M.I.); and *Wilson v. Commonwealth*, 17 Va. Cir. 144 (1989) (Virginia State University).

## 4. *Sovereign Immunity*

The immunity of the Commonwealth and its agencies from suit, unlike that of its employees, is absolute unless waived. *Baumgardner v. Southwestern Va. Mental Health Inst.*, 247 Va. 486, 490, 442 S.E.2d 400 (1994). The "sovereign is immune not only from actions at law for damages but also from suits in equity to restrain the government from acting or compelling it to act." *Hinchey v. Ogden*, 226 Va. 234, 239, 307 S.E.2d 891 (1983). Sovereign immunity is a "rule of social policy, which protects the state from burdensome interference with the performance of its governmental functions and preserves its control over state funds, property, and instrumentalities." *Messina v. Burden*, 228 Va. 301, 308, 321 S.E.2d 657 (1984), *quoting with approval* 72 Am. Jur. 2d, *States, Territories, and Dependencies*, § 99. To sue the Commonwealth, or any of its agencies, the complainant must point to specific statutory language wherein the General Assembly has unmistakably waived sovereign immunity. "Waiver of [sovereign] immunity cannot be implied from general statutory language or by implication." *Hinchey v. Ogden, supra* at 241, *quoting with approval Tunnel District v. Beecher*, 202 Va. 452, 457, 117 S.E.2d 685 (1961). *See also Virginia Bd. of Medicine v. VPTA*, 13 Va. App. 458, 413 S.E.2d 59 (1991),

*aff'd* 245 Va. 125 (1993) (sovereign immunity precluded circuit court from enjoining enforcement of state agency's allegedly unlawful *de facto* rule).

"The right to sue a state does not exist *ex debito justitiae*. The privilege of suing her is a grace which she extends or withholds as to her may seem just and proper . . . ." *Maury v. Commonwealth*, 92 Va. 310. (1895). However, "the sovereign is as liable for its contractual debts as any citizen would be, and that liability may be enforced by suit in the 'appropriate circuit court' . . . if proper and timely proceedings are taken." *Wiecking v. Allied Medical Supply Corp.*, 239 Va. 548, 553, 391 S.E.2d 258 (1990). The holding in *Wiecking* is limited to the situation where "the state contracts for goods or services, receives the benefit of the contract, and then refuses to honor its obligations." *Id.* at 551, 391 S.E.2d at 260. The Plaintiff has ingeniously styled its right of action in contract raiment, but, in the sunshine of the courtroom, the gossamer fabric of the Plaintiff's argument is nearly transparent, and its claim stands revealed for what it is, a naked attack on the discretionary act of a governmental official, which is the quintessential governmental action to which the doctrine of sovereign immunity has been historically applied. The Board of Visitors is authorized by statute to "make all needful rules and regulations concerning the University . . . and generally direct the affairs of the University." Virginia Code § 23-164.6. The acts complained of are authorized acts of the Defendant and were within the prerogatives of the office of the President and the authority of the Board of Visitors of the University.

### 5. *Contract Action*

Even if this were truly a contract action outside the protection of the mantle of sovereign immunity, it would still fail. Whether a contract is ambiguous or incomplete is a question of law. *See Ross v. Craw*, 231 Va. 206, 213, 343 S.E.2d 312 (1986). The Governance Provisions are clear and unambiguous.

"The ideal result that legal draftsmen seek to attain and that judicial interpreters commonly seek to find in a written contract is that a judge should be able, by reading the contract without lifting his eyes from the page, to determine its one and only 'true' meaning in relation to the issues being litigated. Once this 'true' meaning has been ascertained, no other evidence should be permitted to fritter away the meaning and thus make written contracts unreliable." Patterson, *The Interpretation and Construction of Contracts*, 64 Colum. L. Rev. 833-855 (1964).

The Supreme Court of Virginia has long followed the plain meaning rule in cases of contract construction, and recent cases indicate that there is no trend toward relaxation of that rule. *See Brooks v. Bankson*, 248 Va. 197, 203-204, 445 S.E.2d 473, 476-77 (1994); and *Clinch Valley Physicians v. Garcia*, 243 Va. 286, 414 S.E.2d 599 (1992). In *Graphic Arts Mutual Ins. Co. v. C. W. Warthen Co.*, 240 Va. 457, 459-460, 397 S.E.2d 876 (1990), the Supreme Court stated:

> [I]n the absence of an ambiguity . . . we must interpret the contract by examining the language explicitly contained therein. "Where an agreement is complete on its face, is plain and unambiguous in its terms, the court is not at liberty to search for its meaning beyond the instrument itself." *Globe Co. v. Bank of Boston*, 205 Va. 841, 848, 140 S.E.2d 629, 633 (1965) (citations omitted).

In *Wilson v. Holyfield*, 227 Va. 184, 187, 313 S.E.2d 396 (1984), the Supreme Court, in discussing the plain meaning rule, stated:

> A corollary to the last stated principle (plain meaning rule) is that courts cannot read into contracts language which will add to or take away from the meaning of the words already contained therein. *See Virginian Ry. Co. v. Avis*, 124 Va. 711, 719, 98 S.E. 638, 640 (1919).

### 6. *Parol Evidence*

As the Supreme Court recently restated in *Aetna Cas. & Sur. Co. v. Fireguard Corp.*, 249 Va. 209 (1995):

> When a contract is complete on its face and is plain and unambiguous in its terms, a court is not free to search for its meaning beyond the contract itself. *Management Enterprises v. Thorncroft Co.*, 243 Va. 469, 472, 416 S.E.2d 229, 231 (1992). . . . An "ambiguity" is defined as "the condition of admitting of two or more meanings, of being understood in more than one way, or of referring to two or more things at the same time." *Berry v. Klinger*, 225 Va. 201, 207, 300 S.E.2d 792, 796 (1983) (quoting Webster's Third New International Dictionary 66 (3d ed. 1976)).

The Plaintiffs have set forth a lot of contextual evidence in the "Facts" in their brief, see Complainant's Memo. in Support of its Motion for Partial Sum. Judg., pp. 3-15, and have submitted two bound volumes of back-

ground documents referenced in their requests for admission and supporting the history recited in their brief. While this information is interesting and may explain the disgruntled faculty members' frustration, none of it can contravene the clear and unambiguous provisions of the JMU Handbook.

### 7. No Breach of Contract

"To be valid and enforceable, the terms of an . . . agreement must be reasonably certain, definite, and complete to enable the parties and the courts to give the agreement exact meaning." *Richardson v. Richardson*, 10 Va. App. 391, 396, 932 S.E.2d 688 (1990). "Certainty means that each term is expressed in an exact manner . . . ." *Beach v. Virginia Nat'l Bank*, 235 Va. 376, 378, 367 S.E.2d 516 (1988).

Critical to the resolution of this case is an understanding of the term "promise" in the context of contract law. "A promise is a manifestation of intention to act or refrain from acting in a specified way, so as to justify a promisee in understanding that a commitment has been made." Restatement (Second) of Contracts § 2 (1981). "Words of promise which by their terms make performance entirely optional with the 'promisor' whatever may happen, or whatever course of conduct he may otherwise pursue, do not constitute a promise." Restatement (Second) of Contracts § 2, comment e. "[T]he mere expression of an intention or desire is not a promise . . . ." 17A Am. Jur. 2d, *Contracts*, § 3. *See also* 1 Williston on Contracts, 3d ed. §§ 45 and 46. Consequently, in *Allen v. Aetna Cas. Co.*, 222 Va. 361, 281 S.E.2d 818 (1981), the Supreme Court held that an agreement to settle, without specifying more, was nothing more than an agreement to negotiate in the future and was not an enforceable contract.

When all conflicts and just inferences are resolved in the Plaintiff's favor, it is problematic as to whether the Defendant would follow any faculty recommendation, assuming one were made. An interesting lexical discussion of the meaning of the word "recommendation" is set forth in *The Oxford English Dictionary*, vol. XIII (2d ed. 1989), p. 349, and the word has never had the mandatory meaning or connotation which is argued by the plaintiffs, i.e., that the recipient of a recommendation is bound to follow it. On the contrary, the recipient may ignore a recommendation to his ultimate credit as was the case when Lincoln refused to heed the recommendations of some of his cabinet to cashier Grant, or he may ignore the recommendation to his ultimate regret as when Julius Caesar ignored Calpurnia's entreaties and went to the Senate on the Ides of

March. On the one hand, "in the multitude of counselors, there is safety," *Bible*, Proverbs 11:14, but on the other, "he who builds to every man's advice will have a crooked house." Ultimately, the decision maker must make the decision and bear the responsibility.

The president of JMU has the "final authority and responsibility" for curriculum matters. Accordingly, the president has the power to act contrary to the faculty recommendations with respect to curriculum matters, and a faculty recommendation is not a condition precedent to the president's power to invoke his "final authority" in curriculum matters. "A condition is an event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due." Restatement (2d) Contracts, § 224. Whether the program changes are "curriculum changes" or program retrenchment, the result is the same.

As the Supreme Court observed in *Smith v. Farrell*, 199 Va. 121, 129, 98 S.E.2d 3 (1957), this is "another of those unfortunate cases where all were hopeful, but the ship failed to reach port." The crew may be displeased with the captain, but that displeasure does not give rise to a right of action cognizable in the Commonwealth. No one is bound by a recommendation, which is merely a suggestion which the proposer hopes will be followed. An illustration of enforceable contract promises would be the specific payment terms of the individual faculty member's contract with the University, which, if breached, may provide a basis for monetary damages. Personal service contracts setting compensation, the term of service, and the duties to be performed are ready examples of definite and enforceable contractual provisions, and such concrete terms stand in stark contrast to the general, exhortatory, and, therefore, unenforceable, as a contract, terms of the Governance Procedures of the James Madison University Faculty Handbook which relate to curriculum changes and which describe the faculty as having "the 'primary role' in connection with the development, modification and review of the curriculum, and the president of JMU as having the 'final authority and responsibility' for curriculum matters." Bill of Complaint, para. 10. These governance provisions expressed the parties' hopes and expectations with respect to faculty reorganizations and curriculum changes, but, as applied to the facts of this case, they are not an enforceable contract between the defendant and the faculty as to the faculty's mandatory participation in the curriculum changes which the President made and which the Board of Visitors has not rescinded. FRC's remedy as a group in this case is political not legal.

### III. *Decision*

For the foregoing reasons it is adjudged and ordered that the Plaintiff's Motion for Partial Summary Judgment is denied and the Defendant's Motion for Summary Judgment is granted.